Flannery, J.
The plaintiff, Sylvia Smith Bowman (“Bowman”), is a 66-year-old woman who at the time of the incident that gives rise to this action was a Social Work Supervisor in the Worcester Office of the Massachusetts Department of Public Welfare (“the Department”). Bowman worked for the Department from 1967 until August of 1991, when she left pursuant to an agreement. The defendant, David Heller (“Heller”), worked at the same Worcester Office at all times relevant to this matter, and continues to work for the Department.
Throughout the summer and fall of 1987, Bowman was running for the presidency of Local 509 of the Service Employees International Union (“the Union”). On or about October 23, 1987, Heller prepared and distributed to various co-employees two photocopies of caricatures depicting Bowman’s head and name, taken from her campaign postcard, superimposed over nude and partially nude female bodies (“the photocopies”). Heller was suspended from his employment for one week, from April 25 to April 29, 1988, as a result of this incident. Bowman now sues Heller for *52 intentional infliction of emotional distress (Count IV), reckless infliction of emotional distress (Count V), and violation of her right to run for Union office and to be free from sexual harassment pursuant to the Massachusetts Civil Rights Act (Counts VII and XIII).
On or about January 12, 1988, Bowman posted in the Worcester Welfare Office a document titled “Charges Against David Heller” (the “Charges”) which she had previously photocopied onto Union stationery. The Charges were those brought by Arthur Casey, a vice-president of the Union, against Heller on Bowman’s behalf. A month later, on or about February 11, 1988, Bowman prepared a memorandum to her immediate supervisor regarding sicktime she was planning to take which referenced Heller and the photocopies incident (the “Sicktime Memo”). Heller asserts in his counterclaims against Bowman that these two documents were defamatory.
The plaintiffs claims and defendant’s counterclaims were tried jury waived from April 5 to April 14, 1993. On the basis of the evidence, which consisted of 34 exhibits[2] and the testimony of twelve witnesses, I make the following findings and rulings pursuant to Mass.R.Civ.P. 52(a).
Bowman graduated from Vassar in 1949 and worked in various companies holding managerial positions before she became a social worker for the Massachusetts Department of Public Welfare in 1967. She was promoted to supervisor in 1970, and worked in such capacity until she left the Department in August of 1991 pursuant to the agreement referred to in note 1, above. During most of her career as a social worker, Bowman was also active in Local 509 of the Service Employees International Union whose members include social workers in the Department and other state employees. At various times from 1967 to 1987 Bowman served in a number of Union offices, including Statewide Recording Secretary, Trustee, Vice President of the Worcester Region’s Welfare Chapter, Joint Board Member, Executive Board Member, Trial Board Delegate, and Steward.
In 1987 Bowman decided to make a second run for the presidency of the Union (her first attempt in 1985 having been unsuccessful), and she campaigned actively throughout the summer and fall of that year. Heller opposed Bowman’s candidacy, supporting instead the incumbent president, Fred Trusten. Heller worked on Trusten’s campaign by passing out campaign and his own written endorsement of Trusten to his co-workers (ex. 27, 28).
On or about October 23, 1987, during the election campaign period, Heller prepared and distributed two photocopies of nude and partially nude female bodies in sexually explicit poses, superimposed with Bowman’s face and name taken from her campaign postcard (ex. 3A, 3B). One photocopy depicted Bowman in a masturbatory position, completely nude, and the other depicted her partially nude, holding a banana, with her legs spread apart to expose her genitals. The original photographs (prior to their alteration by Heller) were taken from a pornographic magazine. Heller’s preparation and distribution of these photocopies took place at work during working hours, and with the use of office photocopy equipment. Heller either gave or showed the photocopies to at least five co-workers: Richard Williamson, Victor Lempicki, Scott Butler, Kenneth Saunders, and Bowman’s campaign treasurer, Jeanne Lacey.
It was Heller’s practice to create and distribute “satirical” paste-up photocopies around the office (ex. 5A-5E). In addition, he would often display such photocopies by hanging them up on his cubicle walls. With the photocopies of Bowman, however, Heller did not hang them on his walls and, according to his testimony, he gave or showed them only to people he thought would appreciate their “off-color” humor. Heller testified repeatedly that his intent was to make Bowman “look ridiculous,” as ridiculous as he felt her ideas were during the Union election campaign. Heller also testified, however, that it was not his intent to sway votes or to induce people not to vote for Bowman.
While comics, jokes, and satirical pictures circulated regularly in the Worcester Welfare Office, the testimony of several witnesses established that the photocopies of Bowman stood apart from the rest both in terms of their sexually explicit content and their focus on a specific co-worker from the same office. Heller himself had never before used pornographic pictures for his paste-up creations (featuring men for the most part). Given the nature of the Bowman photocopies and the office practice of circulating “humorous” material, it is fairly inferable from the evidence, and so I find, that Heller was aware when distributing the photocopies that Bowman would be upset by them if she saw them, and furthermore, that she was substantially certain to see them.
The photocopies of Bowman did indeed achieve circulation beyond those co-workers Heller originally gave them to. For example, Jeanne Lacey testified that she saw various Department employees making additional copies of the Bowman photocopies, and Susan Caramielo, a witness for the defense, stated that she first saw one or both of the photocopies as they were being passed among a group of Department employees from different floors of the Worcester Office. Ultimately, Scott Butler, one of the people who received the photocopies directly from Heller, in turn gave copies of them to his friend and Bowman’s campaign coordinator, John Stockman (“Stockman”). On or about October 26, 1987, Stockman told Bowman about the photocopies and described their contents, but he tried to minimize the situation in order not to distract her from her campaign. He and Bowman decided that she should not see the photocopies until she was done with her active campaigning. Although Bowman asked around the Worcester Office to determine how widespread the distribution of the photocopies was, she tried to make light of the incident in order to keep the campaign issues focused.
*53 On or about November 18, 1987, after active campaigning for the Union election had ended but before the election results were known, Bowman finally received the photocopies from Stockman. They met at a luncheonette during the morning break from work and Stockman gave the photocopies to her in a sealed envelope, advising her to look at them when she was at home. Bowman opened the envelope once she was alone, however, and experienced such shock that she does not recall clearly what she did afterwards. According to the testimony of Cindy Cardone (“Car-done”) , the owner of a bookstore near the luncheonette at the time of this incident, Bowman came into her store that same morning in great physical and emotional distress, unable to speak or breathe normally and perspiring heavily. Cardone feared that Bowman was suffering a heart attack or stroke. When Bowman was finally able to speak, she explained that she had just had a great shock and showed the photocopies to Cardone. Feeling that Bowman needed some privacy to pull herself together, Cardone closed her store for approximately 45 minutes.
Bowman testified to feeling degraded, publicly humiliated, and vulnerable upon seeing the photocopies; she also felt that the matter was too serious for her to remain silent. During the remainder of the day and for the rest of the week, Bowman showed the photocopies to various Department and Union Officials in an effort to elicit some remedial response. As part of this effort, on or about November 19, 1987, Bowman took pictures of Heller and his work station, where he had other paste-up photocopies displayed, in order to identify him as the perpetrator of the photocopies (ex. 21A-21E). One of the pictures she took showed the back of a client’s head. Heller complained about Bowman’s photograph, and the Department promptly investigated and took disciplinary action against her.
In contrast, the Department was slow and tentative in its response to Bowman’s complaint against Heller. The Department conducted no official investigation until late December. On or about December 30, 1987, Heller admitted in a Department interview that he had prepared and distributed the photocopies to five co-workers (ex. 32). On April 1, 1988, the Department notified Bowman that it found Heller’s actions regarding the photocopies to constitute sexual harassment and that it would take appropriate action (ex. 23). Later that month, Heller was suspended from work without pay for five days, to which Heller responded by “grieving” the suspension. On February 15, 1989, almost a year later, Heller made a public, written apology to Bowman (ex. 30). On January 23,1990, Heller signed a Memorandum of Understanding with the Department agreeing to “reasonably avoid physical and verbal contact” with Bowman in the workplace (ex. 31).
The shock and emotional distress Bowman experienced upon first seeing the photocopies persisted and Bowman was eventually diagnosed as suffering from Post-Traumatic Stress Disorder (“PTSD”). Bowman’s current treating psychotherapist, Maureen Lavallee, Ph.D., testified that PTSD is triggered by an event outside the normal range of human experience and manifests in symptoms such as psychogenic amnesia, disassociation, flashbacks, fearfulness, an exaggerated startle response, psychic numbness, problems with concentration and memory, uncontrollable crying, loss of trust, and loss of interest in formerly pleasurable activities. Dr. Lavallee further testified that although Bowman’s past medical and mental health history make her present symptoms more severe, the specific event which caused the PTSD was the photocopies incident. That testimony was essentially uncontradicted. I find that neither the loss of the Union election nor childhood trauma is the cause of Bowman’s emotional distress and related symptoms. I find, rather, that Heller’s preparation and distribution at work of photocopies which depict Bowman in sexually explicit poses and hold her up to ridicule, an event outside the normal range of human experience, caused Bowman’s emotional distress and PTSD.
Heller’s counterclaims of defamation stem from two events. On or about January 12, 1988, Bowman posted in the Worcester Welfare Office the “Charges Against David Heller" (the “Charges”) filed with the Union Trial Board (ex. 7). The Charges had been prepared by Bowman and signed by Arthur Casey, a Vice President of the Union, who was bringing the complaint against Heller on Bowman’s behalf. The Charges actually filed with the Trial Board were on blank paper, but Bowman copied them onto Union letterhead prior to posting them in the Worcester Office in order to comply with the contractual requirement that anything posted on the Union bulletin board be on Union letterhead (ex. 22). Other than the stationery on which they appeared, the posted charges were a true copy of the charges as filed. Furthermore, it was a practice of the Union to post charges filed with the Trial Board on the Union bulletin board, as long as the outcome of the trial was also posted.
On or about February 11, 1988, Bowman sent a memorandum (the “Sicktime Memo”) to her supervisor, with copies to others who had management or record keeping responsibilities, regarding sicktime she was planning to take (ex. 8). She also gave copies of the memo to various Union officials such as the Union stewards from her office. In the memo, Bowman referred to the photocopies incident as a “sexual assault." I find that Bowman used the term “sexual assault" because of a good faith belief that the term was appropriate to describe the sort of personal attack the photocopies represented, and that those receiving the memo would not have understood the term to mean an actual crime called sexual assault. In addition, I find that Heller has not established by a preponderance of the evidence that his reputation was injured among a substantial and respectable group of people in his work or residential community with regard to either of the incidents above.
Based on the foregoing facts, I rule as follows on the law.[3] To begin, Bowman’s tort claims allege both intentional and reckless infliction of emotional dis *54 tress (Counts IV and V). According to Massachusetts law, however, intentional and reckless infliction of emotional distress have essentially the same elements and burdens of proof. See Simon v. Solomon, 385 Mass. 91, 95 (1982); Tilton v. Franklin, 24 Mass.App.Ct. 110, 112 (1987). Thus, in order to hold Heller liable for damages suffered as a result of either, Bowman must show that (1) Heller intended to inflict emotional distress or he knew or should have known emotional distress was the likely result of his conduct; (2) Heller’s conduct was extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community; (3) Heller’s actions were the cause of Bowman’s distress; and (4) the emotional distress suffered by Bowman was severe and of a nature that no reasonable person could be expected to endure it. Agis v. Howard Johnson Co., 371 Mass. 140, 144-45 (1976).
By Heller’s own admission, his intent in creating and distributing the pornographic photocopies was to ridicule Bowman. For this purpose, he chose to superimpose Bowman’s face onto images that were particularly suggestive and sexually explicit, reducing Bowman to nothing more than a sexual object. While Heller argues that he never intended or expected Bowman to actually see the photocopies (whatever his intent may have been in creating and distributing them), the fact remains that circulation of non-work related “humorous” material was common practice in the office. Heller was not only well aware of this, he himself initiated such circulation of his other photocopied works on several occasions. Given the immediate notoriety which the Bowman photocopies were certain to achieve, Heller, at the very least, knew or should have known that Bowman was not only likely to see the photocopies, but was likely to suffer emotional distress as a result.
That Heller’s conduct was extreme and outrageous is amply supported by the photocopies themselves. No one who testified from the Worcester Welfare Office, including Heller, could recall another “humorous” picture or photograph passed around which even remotely resembled the Bowman photocopies. Indeed, the kind of gross, personal, and pornographic attack that the photocopies represent is well outside the bounds of decency in a civilized society. During testimony at trial. Dr. Maureen Lavallee, Bowman’s treating psychotherapist, also characterized the photocopies incident as a traumatic event outside the normal range of human experience. The second element of the Agis standard is thus satisfied as well.
Dr. Lavallee’s uncontradicted medical testimony furthermore established a causal link between Heller’s creation and distribution of the photocopies and Bowman’s Post-Traumatic Stress Disorder (“PTSD”). While Heller suggests that Bowman’s own troubled medical and mental health history mitigates, if not eliminates, any liability on his part, such argument directly contravenes the general tort principle that an actor takes the victim as he finds her. Bowman’s medical and mental health history therefore may make her present symptoms more severe, but it does not lessen the causal link between Heller’s conduct and Bowman’s injuries.
Finally, the severity of Bowman’s emotional distress is borne out by the diagnosis of PTSD. Consistent with that diagnosis, Bowman has experienced (and continues to experience) a range of symptoms from psychogenic amnesia, to an exaggerated startle response, to loss of interest in formerly pleasurable activities. Bowman is still in active treatment and therapy, and according to Dr. Lavallee, such treatment will probably have to continue for several more years.
Even if Bowman has proven all the elements of intentional infliction of emotional distress by a preponderance of the evidence, Heller argues that Hustler Magazine v. Falwell, 485 U.S. 46 (1988), nevertheless precludes Bowman from maintaining this claim against him. In Hustler Magazine, the Supreme Court held that the First and Fourteenth Amendments prohibit public figures and public officials from recovering damages for intentional infliction of emotional distress based on the publication of caricatures “doubtless gross and repugnant in the eyes of most,” without a further showing that the publication contains a false statement of fact which was made with actual malice. Id.
The applicability of Hustler Magazine's First Amendment analysis depends initially on whether or not Bowman can be deemed a “public figure.” Heller states that by running for the Union presidency, Bowman voluntarily injected herself into a particular public controversy and thereby became a public figure for a limited range of issues. Gertz v. Robert Welch, Inc., 418 U.S. 323, 351-52 (1974). Several Massachusetts cases have in fact more specifically held that union officials or those running for union office are public figures within the meaning of Gertz. See Materia v. Huff, 394 Mass. 328, 331 (1985); Lyons v. New Mass Media, Inc., 390 Mass. 51, 55-56 (1983). It therefore seems that Bowman became a public figure with respect to the Union election by virtue of her candidacy.
Despite Bowman’s status as a public figure, Hustler Magazine is distinguishable from the present case in two important aspects. First, the ad parody at issue in Hustler Magazine contained an articulable statement and criticism about the kind of public figure Falwell was. By depicting Falwell as having engaged in a drunken, incestuous rendezvous with his mother, the magazine was implying sexual and moral hypocrisy on the part of Falwell, the nationally known leader of the Moral Majority. By contrast, there is no articulable political statement which can be gleaned from the photocopies of Bowman. Although Heller stated that he intended to make Bowman look as ridiculous as he felt her ideas were during the Union campaign, he was unable during the trial to articulate exactly how the pornographic images of Bowman conveyed such an *55 opinion. See, e.g., Trial Transcript, Vol. 7 at 39. It appears that Heller could not so state because the photocopies were nothing more than a reduction of Bowman to a sexual object and an attack on her as a woman, rather than as a political candidate.
The United States Supreme Court has long recognized that not all speech is of equal First Amendment importance. In FCC v. Pacifica Foundation, 438 U.S. 726 (1978), the Court stated that speech that is “ ‘vulgar, ‘offensive,’ and ‘shocking’ ” is “not entitled to absolute constitutional protection under all circumstances.” Id. at 747. See also, Chaplinsky v. New Hampshire, 315 U.S. 568 (1942) (state can lawfully punish speech that by its very nature inflicts injury or incites to immediate violence). Thus a second and perhaps more crucial point of departure between Hustler Magazine and the instant case is that while the Falwell ad parody was published inside the front cover of a national magazine, Heller “published” his photocopies of Bowman at their mutual place of employment. Heller’s attempt to characterize the photocopies as constitutionally valid political speech must therefore be additionally scrutinized in light of the employment context which frames the entire incident.
First Amendment concerns are subject to various restrictions in the workplace where employees may be a captive audience or countervailing employer interests may take precedence. See Lewis v. Director of the Division of Employment Security, 379 Mass. 918 (1980) (denial of unemployment benefits affirmed where General Dynamics employee wore “Strike-G.D.” jacket to work); Bryson v. City of Waycross, 888 F.2d 1562 (11th Cir. 1989) (police captain’s statements so disruptive to police department that city’s interest in assuring efficient police protection outweighed captain’s free speech interest). See also, McMullen v. Carson, 568 F.Supp. 937 (M.D. Fla. 1983). One permissible workplace restriction on First Amendment freedoms is the prohibition against speech, expression, and/or conduct which constitutes sexual harassment. As one United States District Court recently stated:
[Pornographic] pictures and verbal harassment are not protected speech because they act as discriminatory conduct in the form of a hostile work environment. See Roberts v. United States Jaycees, 468 U.S. 609, 628, 104 S.Ct. 3244, 3255, 82 L.Ed.2d 462 (1984). (“[P]otentially expressive activities that produce special harms distinct from their communicative impact . . . are entitled to no constitutional protection.”); Hishon v. King & Spalding, 467 U.S. 69, 78, 104 S.Ct. 2229, 2235, 81 L.Ed.2d 59 (1984); Strauss, Sexist Speech in the Workplace, 25 Harv.C.R.-C.L.L.Rev. 1, 38-41 (1990). In this respect, the speech at issue is indistinguishable from speech that comprises a crime, such as threats of violence or blackmail, of which there can be no doubt of the authority of the state to punish. (Citations omitted.)
Robinson v. Jacksonville Shipyards, Inc., 760 F.Supp. 1486, 1535 (M.D. Fla. 1991). Thus in the employment context, when “expression” becomes nothing more than prohibited sexual harassment, a perpetrator cannot shield himself from tort or other civil liability by claiming First Amendment privilege. Had Heller distributed the Bowman photocopies elsewhere the analysis might be different; however, Heller chose to pass the photocopies out at work to his and Bowman’s co-employees. In so doing, he crossed the line from any semblance of free expression into unlawful conduct specifically prohibited by several Massachusetts statutes.
In Count XIII of her Complaint, Bowman alleges that Heller violated her civil right to be free from sexual harassment pursuant to the Massachusetts Civil Rights Act (“MCRA”). Section 11H of M.G.L.c. 12 provides a state remedy for interference or attempts to interfere with the exercise or enjoyment of rights secured by the Constitution or laws of the United States or rights secured by the Constitution or laws of the Commonwealth by threats, intimidation, or coercion. The private counterpart to section 11H is section 111, which authorizes a private cause of action for similar interference with secured rights.
Bowman’s statutory right to be free from sexual harassment specifically arises from M.G.L.c. 214 §1C which provides in relevant part:
A person shall have the right to be free from sexual harassment, as defined in chapter one hundred and fifty-one B and fifty-one C.
Sexual harassment is defined in turn by M.G.L.c. 151B §1(18) as:
Sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when (a) submission to or rejection of such advances, requests or conduct is made either explicitly or implicitly a term or condition of employment or as a basis for employment decisions; (b) such advances, requests or conduct have the purpose or effect of unreasonably interfering with an individual’s work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment.
Putting the above statutes together, Bowman must show by a preponderance of the evidence that (1) Heller’s conduct was of a sexual nature; (2) it unreasonably interfered with her work performance; (3) by creating a hostile, intimidating, humiliating, or sexually offensive work environment; and (4) such interference was accomplished by threats, intimidation, or coercion within the meaning of M.G.L.c. 12 §§11H and 111.
With respect to the first element, it is beyond doubt that the photocopies created and distributed by Heller constitute verbal conduct of a sexual nature. Clearly, images of a woman masturbating or exposing her genitals are explicitly sexual images. With respect to the second and third elements, whether or not Heller’s conduct unreasonably interfered with Bowman’s work *56 performance is measured in part by the degree to which the conduct created a hostile work environment. In Meritor Savings Bank v. Vinson, 477 U.S. 57 (1986), the Supreme Court stated that for sexual harassment to be actionable, it must be sufficiently severe or pervasive to alter the conditions of the victim’s employment and create an abusive working environment. The Supreme Judicial Court essentially relied on the same analysis in College-Town, Division of Interco, Inc. v. Massachusetts Commission Against Discrimination, 400 Mass. 156 (1987), when it held that the behavior of Chester Broad, College-Town’s supervisory employee, was “sufficiently pervasive to alter the conditions of [Loretta] Rizzi’s employment, and thus created a sexually harassing working environment.” Id. at 162.
Traditionally, the severity or pervasiveness of the harassing conduct was to be measured from the standpoint of a reasonable person in the plaintiffs position. See Gnerre v. Massachusetts Commission Against Discrimination, 402 Mass. 502, 507 (1988). The growing trend nationally, however, seems to be one of adopting a reasonable woman standard for sexual harassment cases. As the Eighth Circuit Court of Appeals very recently stated in Burns v. McGregor Electronic Industries, Inc., for example, “We must view the harassment from the victim’s perspective, and in this case the victim is a woman.” 989 F.2d 959, 965 (8th Cir. 1993). The Court then went on to cite the Court of Appeals for the Third Circuit in Andrews v. City of Philadelphia, 895 F.2d 1469, 1485-86 (3d Cir. 1989):
Obscene language and pornography quite possibly could be regarded as highly offensive to a woman who seeks to deal with her fellow employees and clients with professional dignity and without the barrier of sexual differentiation and abuse. Although men may find these actions harmless and innocent, it is highly possible that women may feel otherwise.
Id. See also, Robinson v. Jacksonville Shipyards, Inc., 760 F.Supp. 1486, 1526 (M.D. Fla. 1991) (to implement fully the promise of Title VII, “the standards for assessing women’s psychological harm due to harassment must begin to reflect women’s sensitivity to behavior once condoned as acceptable.”); Ellison v. Brady, 924 F.2d 872, 879 (9th Cir. 1991) (“We . . . prefer to analyze harassment from the victim’s perspective. A complete understanding of the victim’s view requires, among other things, an analysis of the different perspectives of men and women.”); Yates v. Avco Corp., 819 F.2d 630, 637 & n. 2 (6th Cir. 1987) (stating that “men and women are vulnerable in different ways and offended by different behavior ”).
In adopting a reasonable woman standard by which to gauge the severity or pervasiveness of sexually harassing conduct, courts seem to be recognizing that the reasonable person standard often allows a male bias to creep in, thereby perpetuating the status quo. If the purpose of laws providing remedies for sexual harassment at work is to break down barriers to the full participation of women in the workplace, College-Town, Division of Interco, Inc. v. Massachusetts Commission Against Discrimination, 400 Mass. 156, 162 (1987), then the conduct must indeed be analyzed from a woman’s perspective. Heller argues, however, that when analyzed from either the perspective of a reasonable woman or reasonable person, his conduct was not sufficiently severe or pervasive to alter the conditions of Bowman’s employment.
Heller relies in part on the theory that one incident of sexually offensive conduct does not a hostile environment make. He claims, rather, that Bowman must show a pattern of offensive conduct. Heller thus seems to be urging the court to apply a numerosity requirement without regard to the fact that even one incident, if severe enough, could quite possibly alter the conditions of employment for the victim. The landlord perpetrator in Gnerre v. Massachusetts Commission Against Discrimination, 402 Mass. 502, 507 (1988), made a similar argument in the discriminatory housing context, to which the Supreme Judicial Court replied:
[W]e specifically reject Gnerre’s suggestion that we impose, as a matter of law, a quantitative requirement on the incidents of harassment that will constitute actionable sex discrimination. In College-Town, this court did not impose such a requirement in the context of sexual harassment in the workplace.
This court similarly rejects the argument that Bowman must meet some sort of numerosity requirement by showing a pattern of offensive behavior on Heller’s part.
Despite Heller’s attempt to characterize his conduct as merely one isolated incident, the way in which he prepared and distributed the Bowman photocopies renders his conduct not only severe, but pervasive as well. The photocopies at issue in this case unambiguously targeted Bowman. By taking both her name and her face from one photograph and superimposing them onto other photographs of nude and partially nude female bodies, Heller specifically made Bowman the subject of the pornographic images. It was a most unwelcome appropriation of her person, and specifically her sexuality, for his hostile purposes. Heller did not then merely place the photocopies on Bowman’s desk or show them only to her, he distributed them at work where they soon proliferated throughout the office. The pornographic photocopies of Bowman thus infested Bowman’s workplace. They made her feel “fearful,” “vulnerable,” and “degraded.” Knowing so many of her co-workers had seen them and laughed at them made Bowman reluctant to go to work. The entire episode altered the conditions of employment for Bowman, as it would have for the reasonable woman and indeed for the reasonable person. Heller’s creation and distribution of the photocopies clearly created an “intimidating, hostile, humiliating or sexually offensive work environment.” M.G.L.c. 151B §1(18). Heller’s conduct thus violated Bowman’s right to be free from sexual harassment.[4] M.G.L.c. 214 §1C.
*57 Because Bowman invokes M.G.L.c. 12 §§11H and 111 to challenge Heller’s interference with her civil rights, she must show that the interference was accomplished by threats, intimidation, or coercion. Heller vigorously argues that in order for his conduct to be deemed threatening, intimidating, or coercive within the meaning of the MCRA, it must have involved actual or potential physical confrontation accompanied by a threat of harm. Heller relies for this proposition on Bally v. Northeastern University, 403 Mass 713 (1989), and its progeny.[5] In Bally, the plaintiff, a student athlete, claimed that the university violated his civil rights by requiring drug testing as a condition of participation in intercollegiate sports. The court differentiated Bally’s claim from others for which it had previously granted relief under the MCRA on two grounds. First, the previous cases all involved measures directed toward a particular individual or class of persons, whereas Northeastern's drug policy involved “indiscriminate, impartially administered testing.” Id. at 719. Second, cases such as Batchelder v. Allied Stores Corp., 400 Mass. 686 (1985), Bell v. Mazza, 394 Mass. 176 (1985), and O’Connell v. Chasdi, 400 Mass. 686 (1987), “each involved physical confrontation accompanied by a threat of harm.” Id.
Yet Bally itself expressly recognized that “threats, intimidation, and coercion” could involve other than physical confrontation, by stating, “Although Redgrave did not involve physical confrontation, the Boston Symphony Orchestra’s action involved the loss of a contract right.” Bally at 720. The claim in Redgrave v. Boston Symphony Orchestra, Inc., 399 Mass. 93 (1987), had concerned the coercive effect of economic sanctions on the plaintiffs right to engage in unrelated political speech. In other words, the Boston Symphony Orchestra’s cancellation of its contract with Redgrave was a “measure directed toward a particular individual.” Bally at 718. Furthermore, in analyzing an MCRA claim, the Court in Deas v. Dempsy, 403 Mass. 468, 471 (1988), defined coercion as “the application to another of such force, either physical or moral as to constrain him to do against his will something he would not otherwise have done.” (Emphasis added.)
The overly narrow reading of “threats, intimidation, and coercion” articulated in subsequent cases, citing Bally as authority, is also inconsistent with the interpretation of similar terms in other statutes. See e.g., Smith v. Stechel, 510 F.2d 1162, 1164 (9th Cir. 1975) (firing employees who aided others in exercising their rights by renting apartments to members of minority groups would constitute threat, intimidation, coercion, or interference under Fair Housing Act, 42 U.S.C. §3617); United States v. Bruce, 353 F.2d 474, 476-79 (5th Cir. 1965) (economic sanctions by landlord, interfering with right to vote, constituted coercion); United States v. Beaty, 288 F.2d 653, 656 (6th Cir. 1961) (threats of eviction if tenants exercised their right to vote constituted coercion).
Sexual harassment, by its very nature, is threatening, intimidating, and coercive. It is a crude way of telling women that they are neither wanted nor valued in the workplace. As the Supreme Judicial Court stated in College-Town, Division of Interco., Inc. v. Massachusetts Commission Against Discrimination, 400 Mass. 156, 162 (1987), “A work environment pervaded by harassment or abuse, with the resulting intimidation, humiliation, and stigmatization, poses a formidable barrier to full participation of an individual in the workplace." Sexual harassment thus creates a barrier, based solely on gender, to a woman’s full and untrammeled participation in the workplace.
Heller’s photocopies of Bowman explicitly attacked her as a woman. They were intimidating because they communicated to her that despite her long commitment to both her work and union activity, she could quite easily be reduced to nothing more than a naked woman, spread-eagled and exposed. Such a message can be extremely threatening to a woman.
[B]ecause women are disproportionately the victims of rape and sexual assault, women have a stronger incentive to-be concerned with sexual behavior. Women who are the victims of [even] mild forms of sexual harassment may understandably worry whether a harasser’s conduct is merely a prelude to violent sexual assault.
Ellison v. Brady, 924 F.2d 872, 879 (9th Cir. 1991). In this way, sexual harassment may ultimately carry with it an inherent threat of physical confrontation. Bowman testified that Heller’s pornographic photocopies did indeed make her feel vulnerable and afraid. They represented a violation of both her personal and bodily integrity by associating both her name and her face with sexually explicit images. By creating and distributing the photocopies of Bowman, Heller violated Bowman’s right to be free from sexual harassment. Furthermore, such creation and distribution of the photocopies was threatening and intimidating within the meaning of M.G.L.c. 12 §§11H and 111.[6]
In addition to interfering with her right to be free from sexual harassment, Bowman alleges that Heller attempted to interfere with her right to run for union office by the same conduct, also in violation of the MCRA. Bowman’s right to run for union office is secured by the Labor-Management Reporting and Disclosure Act, 29 U.S.C. §481(e), Article I, Parts 1 and 9 of the Massachusetts Constitution, and M.G.L.c. 150E. Because the MCRA imposes liability for attempts as well as for actual interference, there need not be a finding that the distribution of the photocopies did in fact interfere with Bowman’s campaign. Thus the fact that Bowman was able to continue with the campaign until the end does not bar her second MCRA claim.
Heller’s conduct regarding the photocopies amounted to an attempt to interfere with Bowman s right to run for union office. Heller specifically took Bowman’s head and name from her campaign post card in order to create the pornographic photocopies of her. He distributed the photocopies at work to *58 various co-employees, including Bowman’s own campaign treasurer, while active campaigning for the Union presidency was still on-going. As previously established, Heller knew or should have known that given the inflammatory nature of the photocopies and the office practice of circulating various “satirical” materials, Bowman was not only substantially certain to see them, but would be greatly upset by them. Although Bowman chose for strategic reasons not to view the photocopies until active campaigning was over, had she seen them sooner, her reaction to them might very well have interfered with her campaign.
That Heller utilized pornographic images of Bowman in his attempt to interfere with her political rights was inherently intimidating. It is beyond doubt that a reasonable woman (or in the alternative a reasonable person) contemplating a candidacy such as Bowman’s would, at the very least, hesitate to undertake it or to continue if the price exacted is gender-based humiliation in the workplace to the degree which Bowman ultimately experienced.
I turn now to Heller’s counterclaims against Bowman for defamation. Count I involves the “Charges Against David Heller” (the“Charges”) which Arthur Casey filed with the Union Trial Board on Bowman’s behalf. Heller claims that by photocopying the Charges onto Union stationery and then posting them in the Worcester Welfare Office, Bowman “published” statements which were false or from which false and harmful inferences could be drawn. Specifically, Heller argues that the Charges on Union stationery implied that the Union as a body was taking action against him, rather than a fellow Union member. With respect to Count II, Heller claims that Bowman’s reference to the photocopies incident as a “sexual assault” in a memorandum (“Sicktime Memo”) to her supervisor and various other Office and Union personnel falsely accused him of criminal behavior.
In order to prevail on his counterclaims, Heller must prove by a preponderance of the evidence that (1) the statements of and concerning him were defamatory in character; (2) they were false; (3) they were published by Bowman; and (4) he suffered direct and proximate damages as a result. New England Tractor Trailer Training of Connecticut, Inc. v. Globe Newspaper Co., 395 Mass. 471 (1985). The law in Massachusetts is that a publication is defamatory if it holds the plaintiff up to contempt, hatred, scorn, or ridicule or tends to impair his standing in the minds of a considerable and respectable class of the community. Brauer v. Globe Newspaper Co., 351 Mass. 53 (1966); Grande & Son, Inc. v. Chace, 333 Mass. 166 (1955); Tartaglia v. Townsend, 19 Mass.App.Ct. 693 (1985). With respect to statements of opinion,
[a] defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis of the opinion.
Lyons v. Globe Newspaper Co., 415 Mass. 258, 258 (1993), citing National Ass’n of Gov't Employees, Inc. v. Central Broadcasting Corp., 379 Mass. 220, 227 (1979).
Bowman first argues that her statements regarding Heller are not actionable because she had a conditional privilege to publish them. As a Union officer, Bowman claims she had a right to post complying materials pertaining to Union affairs on the Union bulletin board. With regard to the Sicktime Memo, Bowman states she had a legitimate interest in notifying her supervisor and various management or recordkeeping personnel of time she needed off for therapy as a result of the photocopies incident. Bowman defends copies of the Memo which she gave to the Union stewards in her office as a necessary precaution in the event one of them had to represent her in any dispute with management regarding her time off. Bowman cites as authority Humphrey v. National Semiconductor Corp., 18 Mass.App.Ct. 132, 133-34 (1984), which states that a defamatory statement is conditionally privileged if it is published to those with whom the defendant had a legitimate reason for sharing it.
Bowman’s second line of defense is that her statements regarding Heller were merely statements of opinion. Aside from identifying Heller as the perpetrator of the photocopies (admitted as true by Heller), Bowman argues that the other statements contained in the charges only express an opinion about the nature of Heller’s conduct. Bowman additionally argues that her characterization of the photocopies incident as a “sexual assault” was clearly an expression of opinion if taken in context with the rest of the Sicktime Memo. The second half of the Memo referred specifically to the Department’s sexual harassment policy, for example.
Whether or not Bowman had a conditional privilege to publish the documents in question and whether or not Bowman’s statements constituted non-actionable expressions of opinion, Heller’s counterclaims ultimately fail because he has not proved Bowman’s statements actually defamed him. Heller was unable to present more than his own speculation as to how the statements contained in the Charges and the Sicktime memo damaged his reputation or held him up to ridicule and contempt. On the contrary, Heller acknowledged during cross-examination that the reason some of his co-workers, two individuals in particular, stopped talking to him for a period of time may have been because he had created and distributed the obscene photocopies in the first place. See Trial Transcript, Vol. 7 at 17. Furthermore, even if actionable, Heller’s counterclaims are not compensable because he has presented insufficient evidence on the issue of damages. He did not offer any corroborating testimony or produce any evidence causally linking his injuries to the posting of the Charges and/or the circulation of the Sicküme Memo, as opposed to, for example, the Department’s investigation of his misconduct. Heller’s own vague testimony about his injuries, including emotional distress, merely revealed that he did not seek any type of therapy or medical treatment for his symptoms. For the foregoing *59 reasons, I find against the defendant on his counterclaims and they will be dismissed.
Lastly, the plaintiff urges that I award damages to her in a total amount of one hundred sixty thousand dollars ($160,000.00), fifty thousand dollars ($50,000.00) for intentional infliction of emotional distress, fifty thousand dollars ($50,000.00) for reckless infliction, fifty thousand dollars ($50,000.00) for sexual harassment, and ten thousand dollars ($10,000.00) for violating her right to seek Union office.
The plaintiffs approach to the issue of damages is fragmented or duplicative, and I disagree with it. To be sure, the defendant’s vile deed violated several rights of the plaintiff. But the misconduct itself was a discrete event, although the defendant certainly compounded it by his subsequent negative stance. And although the plaintiff was injured in more ways than one, i.e., attempted interference with her campaign as well as emotional distress, the several adverse effects resulted from the defendant’s one outrageous attack. Therefore, while the plaintiff is entitled to be fairly compensated for the pain and suffering inflicted by the defendant, Haddad v. Gonzalez, 410 Mass. 855, 870-71 (1991), and for the reasonable cost of her therapeutic expenses resulting from his attack,[7] subdividing her losses and correlating them with her claims for relief is uncalled for.
I conclude that a total damages award of thirty-five thousand dollars ($35,000.00) will fairly and adequately compensate the plaintiff for her injuries. In keeping with my view of the unitary nature of the harm inflicted here, I also rule that any one of the plaintiffs claims (c. 12, §111, c. 214, §1C, and intentional infliction of emotional distress) is a sufficient basis for the foregoing award.
The plaintiff also seeks costs and reasonable attorneys fees, and she is entitled to them. M.G.L.c. 12, § 1II. The plaintiff may file an appropriate motion, with supporting materials, on or before July 30, 1993, and the defendant may file responsively on or before August 20, 1993. Either party may request a hearing on the motion.
So Ordered.

 There are various gaps in the numerical sequence of the individual exhibits as a result of counsel’s request that official exhibit numbers correspond to their previous numbering systems.

 The plaintiff urges this court to estop defendant Heller from relitigating issues of fact and law already decided in a prior arbitration proceeding which determined that the Department of Public Welfare had just cause to suspend Heller from work as a result of the photocopies incident. S.E.I.U., Local 509 v. Department of Public Welfare (OERARD #1078, November 21, 1991). The plaintiff cites Miles v. Aetna Casualty & Surety Co., 412 Mass. 424 (1992), for the proposition that parties may be bound by an arbitration decision under certain circumstances. I do not apply that principle here because I am uncertain whether the arbitration was a full-blown trial of the issues. In any event, my findings agree with those of the arbitrator.

 I have applied the reasonable woman standard here because, for the reasons stated, it is the correct one. I also find, however, that Heller’s conduct was impermissible sexual harassment by the standard of the reasonable person.

 See e.g. Longval v. Commissioner of Correction, 404 Mass. 325, 333 (1989); Layne v. Superintendent, Massachusetts Correctional Institution, Cedar Junction, 406 Mass. 156, 158 (1989); Eiggins v. Hazen Paper Co., 953 F.2d 1405, 1425 (1st Cir. 1992).

 It is no defense to Bowman’s claim under the MCRAthat Heller did not intend to interfere with her civil rights or did not realize that his conduct would be viewed as sexual harassment. The Supreme Judicial Court has interpreted the MCRA as imposing “no express or implied requirement that an actor specifically intended to deprive a person of a secured right in order to be liable under the statute.” Redgrave v. Boston Symphony Orchestra, Inc., 399 Mass. 93, 99 (1987). See also, O’Connell v. Chasdi, 400 Mass. 686, 694 (1987).

 The plaintiff makes no claim for reduced earning capacity.