# HUSTLER MAGAZINE, INC., ET AL. *v.* FALWELL

No. 86–1278.   Argued December 2, 1987—Decided February 24, 1988

REHNQUIST, C. J., delivered the opinion of the Court, in which BREN-
NAN, MARSHALL, BLACKMUN, STEVENS, O'CONNOR, and SCALIA, JJ.,
joined. WHITE, J., filed an opinion concurring in the judgment, *post*,
p. 57. KENNEDY, J., took no part in the consideration or decision of the
case.

*Alan L. Isaacman* argued the cause for petitioners. With
him on the briefs was *David O. Carson.*

*Norman Roy Grutman* argued the cause for respond-
ent. With him on the brief were *Jeffrey H. Daichman* and
*Thomas V. Marino.**

CHIEF JUSTICE REHNQUIST delivered the opinion of the
Court.

Petitioner Hustler Magazine, Inc., is a magazine of nation-
wide circulation. Respondent Jerry Falwell, a nationally
known minister who has been active as a commentator on
politics and public affairs, sued petitioner and its publisher,
petitioner Larry Flynt, to recover damages for invasion of

*Briefs of *amici curiae* urging reversal were filed for the American
Civil Liberties Union Foundation et al. by *Harriette K. Dorsen, John A.
Powell,* and *Steven R. Shapiro;* for the Association of American Editorial
Cartoonists et al. by *Roslyn A. Mazer* and *George Kaufmann;* for the As-
sociation of American Publishers, Inc., by *R. Bruce Rich;* for Home Box
Office, Inc., by *P. Cameron DeVore* and *Daniel M. Waggoner;* for the
Law & Humanities Institute by *Edward de Grazia;* for the Reporters Com-
mittee for Freedom of the Press et al. by *Jane E. Kirtley, Richard M.
Schmidt, David Barr,* and *J. Laurent Scharff;* for Richmond Newspapers,
Inc., et al. by *Alexander Wellford, David C. Kohler, Rodney A. Smolla,
William A. Niese, Jeffrey S. Klein, W. Terry Maguire,* and *Slade R. Met-
calf;* and for Volunteer Lawyers for the Arts, Inc., by *Irwin Karp* and
*I. Fred Koenigsberg.*

privacy, libel, and intentional infliction of emotional distress. The District Court directed a verdict against respondent on the privacy claim, and submitted the other two claims to a jury. The jury found for petitioners on the defamation claim, but found for respondent on the claim for intentional infliction of emotional distress and awarded damages. We now consider whether this award is consistent with the First and Fourteenth Amendments of the United States Constitution.

The inside front cover of the November 1983 issue of Hustler Magazine featured a "parody" of an advertisement for Campari Liqueur that contained the name and picture of respondent and was entitled "Jerry Falwell talks about his first time." This parody was modeled after actual Campari ads that included interviews with various celebrities about their "first times." Although it was apparent by the end of each interview that this meant the first time they sampled Campari, the ads clearly played on the sexual double entendre of the general subject of "first times." Copying the form and layout of these Campari ads, Hustler's editors chose respondent as the featured celebrity and drafted an alleged "interview" with him in which he states that his "first time" was during a drunken incestuous rendezvous with his mother in an outhouse. The Hustler parody portrays respondent and his mother as drunk and immoral, and suggests that respondent is a hypocrite who preaches only when he is drunk. In small print at the bottom of the page, the ad contains the disclaimer, "ad parody—not to be taken seriously." The magazine's table of contents also lists the ad as "Fiction; Ad and Personality Parody."

Soon after the November issue of Hustler became available to the public, respondent brought this diversity action in the United States District Court for the Western District of Virginia against Hustler Magazine, Inc., Larry C. Flynt, and Flynt Distributing Co., Inc. Respondent stated in his complaint that publication of the ad parody in Hustler entitled

him to recover damages for libel, invasion of privacy, and intentional infliction of emotional distress. The case proceeded to trial.[1] At the close of the evidence, the District Court granted a directed verdict for petitioners on the invasion of privacy claim. The jury then found against respondent on the libel claim, specifically finding that the ad parody could not "reasonably be understood as describing actual facts about [respondent] or actual events in which [he] participated." App. to Pet. for Cert. C1. The jury ruled for respondent on the intentional infliction of emotional distress claim, however, and stated that he should be awarded $100,000 in compensatory damages, as well as $50,000 each in punitive damages from petitioners.[2] Petitioners' motion for judgment notwithstanding the verdict was denied.

On appeal, the United States Court of Appeals for the Fourth Circuit affirmed the judgment against petitioners. *Falwell* v. *Flynt*, 797 F. 2d 1270 (1986). The court rejected petitioners' argument that the "actual malice" standard of *New York Times Co.* v. *Sullivan*, 376 U. S. 254 (1964), must be met before respondent can recover for emotional distress. The court agreed that because respondent is concededly a public figure, petitioners are "entitled to the same level of first amendment protection in the claim for intentional infliction of emotional distress that they received in [respondent's] claim for libel." 797 F. 2d, at 1274. But this does not mean that a literal application of the actual malice rule is appropriate in the context of an emotional distress claim. In the court's view, the *New York Times* decision emphasized the constitutional importance not of the falsity of the statement or the defendant's disregard for the truth, but of the heightened level of culpability embodied in the requirement of "knowing . . . or reckless" conduct. Here, the *New York*

_____

[1] While the case was pending, the ad parody was published in Hustler Magazine a second time.

[2] The jury found no liability on the part of Flynt Distributing Co., Inc. It is consequently not a party to this appeal.

*Times* standard is satisfied by the state-law requirement, and the jury's finding, that the defendants have acted intentionally or recklessly.[3] The Court of Appeals then went on to reject the contention that because the jury found that the ad parody did not describe actual facts about respondent, the ad was an opinion that is protected by the First Amendment. As the court put it, this was "irrelevant," as the issue is "whether [the ad's] publication was sufficiently outrageous to constitute intentional infliction of emotional distress." *Id.*, at 1276.[4] Petitioners then filed a petition for rehearing en banc, but this was denied by a divided court. Given the importance of the constitutional issues involved, we granted certiorari. 480 U. S. 945 (1987).

This case presents us with a novel question involving First Amendment limitations upon a State's authority to protect its citizens from the intentional infliction of emotional distress. We must decide whether a public figure may recover damages for emotional harm caused by the publication of an ad parody offensive to him, and doubtless gross and repugnant in the eyes of most. Respondent would have us find that a State's interest in protecting public figures from emotional distress is sufficient to deny First Amendment protection to speech that is patently offensive and is intended to inflict emotional injury, even when that speech could not reasonably have been interpreted as stating actual facts about the public figure involved. This we decline to do.

At the heart of the First Amendment is the recognition of the fundamental importance of the free flow of ideas and opinions on matters of public interest and concern. "[T]he

---

[3] Under Virginia law, in an action for intentional infliction of emotional distress a plaintiff must show that the defendant's conduct (1) is intentional or reckless; (2) offends generally accepted standards of decency or morality; (3) is causally connected with the plaintiff's emotional distress; and (4) caused emotional distress that was severe. 797 F. 2d, at 1275, n. 4 (citing *Womack* v. *Eldridge*, 215 Va. 338, 210 S. E. 2d 145 (1974)).

[4] The court below also rejected several other contentions that petitioners do not raise in this appeal.

freedom to speak one's mind is not only an aspect of individual liberty—and thus a good unto itself—but also is essential to the common quest for truth and the vitality of society as a whole." *Bose Corp.* v. *Consumers Union of United States, Inc.*, 466 U. S. 485, 503–504 (1984). We have therefore been particularly vigilant to ensure that individual expressions of ideas remain free from governmentally imposed sanctions. The First Amendment recognizes no such thing as a "false" idea. *Gertz* v. *Robert Welch, Inc.*, 418 U. S. 323, 339 (1974). As Justice Holmes wrote, "when men have realized that time has upset many fighting faiths, they may come to believe even more than they believe the very foundations of their own conduct that the ultimate good desired is better reached by free trade in ideas—that the best test of truth is the power of the thought to get itself accepted in the competition of the market . . . ." *Abrams* v. *United States*, 250 U. S. 616, 630 (1919) (dissenting opinion).

The sort of robust political debate encouraged by the First Amendment is bound to produce speech that is critical of those who hold public office or those public figures who are "intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large." *Associated Press* v. *Walker*, decided with *Curtis Publishing Co.* v. *Butts*, 388 U. S. 130, 164 (1967) (Warren, C. J., concurring in result). Justice Frankfurter put it succinctly in *Baumgartner* v. *United States*, 322 U. S. 665, 673–674 (1944), when he said that "[o]ne of the prerogatives of American citizenship is the right to criticize public men and measures." Such criticism, inevitably, will not always be reasoned or moderate; public figures as well as public officials will be subject to "vehement, caustic, and sometimes unpleasantly sharp attacks," *New York Times, supra*, at 270. "[T]he candidate who vaunts his spotless record and sterling integrity cannot convincingly cry 'Foul!' when an opponent or an industrious reporter attempts

to demonstrate the contrary." *Monitor Patriot Co.* v. *Roy*, 401 U. S. 265, 274 (1971).

Of course, this does not mean that *any* speech about a public figure is immune from sanction in the form of damages. Since *New York Times Co.* v. *Sullivan*, 376 U. S. 254 (1964), we have consistently ruled that a public figure may hold a speaker liable for the damage to reputation caused by publication of a defamatory falsehood, but only if the statement was made "with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.*, at 279–280. False statements of fact are particularly valueless; they interfere with the truth-seeking function of the marketplace of ideas, and they cause damage to an individual's reputation that cannot easily be repaired by counterspeech, however persuasive or effective. See *Gertz*, 418 U. S., at 340, 344, n. 9. But even though falsehoods have little value in and of themselves, they are "nevertheless inevitable in free debate," *id.*, at 340, and a rule that would impose strict liability on a publisher for false factual assertions would have an undoubted "chilling" effect on speech relating to public figures that does have constitutional value. "Freedoms of expression require "'breathing space.'" *Philadelphia Newspapers, Inc.* v. *Hepps*, 475 U. S. 767, 772 (1986) (quoting *New York Times, supra,* at 272). This breathing space is provided by a constitutional rule that allows public figures to recover for libel or defamation only when they can prove *both* that the statement was false and that the statement was made with the requisite level of culpability.

Respondent argues, however, that a different standard should apply in this case because here the State seeks to prevent not reputational damage, but the severe emotional distress suffered by the person who is the subject of an offensive publication. Cf. *Zacchini* v. *Scripps-Howard Broadcasting Co.*, 433 U. S. 562 (1977) (ruling that the "actual malice" standard does not apply to the tort of appropriation of a right of publicity). In respondent's view, and in the view of the

Court of Appeals, so long as the utterance was intended to inflict emotional distress, was outrageous, and did in fact inflict serious emotional distress, it is of no constitutional import whether the statement was a fact or an opinion, or whether it was true or false. It is the intent to cause injury that is the gravamen of the tort, and the State's interest in preventing emotional harm simply outweighs whatever interest a speaker may have in speech of this type.

Generally speaking the law does not regard the intent to inflict emotional distress as one which should receive much solicitude, and it is quite understandable that most if not all jurisdictions have chosen to make it civilly culpable where the conduct in question is sufficiently "outrageous." But in the world of debate about public affairs, many things done with motives that are less than admirable are protected by the First Amendment. In *Garrison* v. *Louisiana*, 379 U. S. 64 (1964), we held that even when a speaker or writer is motivated by hatred or ill will his expression was protected by the First Amendment:

> "Debate on public issues will not be uninhibited if the speaker must run the risk that it will be proved in court that he spoke out of hatred; even if he did speak out of hatred, utterances honestly believed contribute to the free interchange of ideas and the ascertainment of truth." *Id.*, at 73.

Thus while such a bad motive may be deemed controlling for purposes of tort liability in other areas of the law, we think the First Amendment prohibits such a result in the area of public debate about public figures.

Were we to hold otherwise, there can be little doubt that political cartoonists and satirists would be subjected to damages awards without any showing that their work falsely defamed its subject. Webster's defines a caricature as "the deliberately distorted picturing or imitating of a person, literary style, etc. by exaggerating features or mannerisms for satirical effect." Webster's New Unabridged Twentieth

Century Dictionary of the English Language 275 (2d ed. 1979). The appeal of the political cartoon or caricature is often based on exploitation of unfortunate physical traits or politically embarrassing events — an exploitation often calculated to injure the feelings of the subject of the portrayal. The art of the cartoonist is often not reasoned or evenhanded, but slashing and one-sided. One cartoonist expressed the nature of the art in these words:

> "The political cartoon is a weapon of attack, of scorn and ridicule and satire; it is least effective when it tries to pat some politician on the back. It is usually as welcome as a bee sting and is always controversial in some quarters." Long, The Political Cartoon: Journalism's Strongest Weapon, The Quill 56, 57 (Nov. 1962).

Several famous examples of this type of intentionally injurious speech were drawn by Thomas Nast, probably the greatest American cartoonist to date, who was associated for many years during the post-Civil War era with Harper's Weekly. In the pages of that publication Nast conducted a graphic vendetta against William M. "Boss" Tweed and his corrupt associates in New York City's "Tweed Ring." It has been described by one historian of the subject as "a sustained attack which in its passion and effectiveness stands alone in the history of American graphic art." M. Keller, The Art and Politics of Thomas Nast 177 (1968). Another writer explains that the success of the Nast cartoon was achieved "because of the emotional impact of its presentation. It continuously goes beyond the bounds of good taste and conventional manners." C. Press, The Political Cartoon 251 (1981).

Despite their sometimes caustic nature, from the early cartoon portraying George Washington as an ass down to the present day, graphic depictions and satirical cartoons have played a prominent role in public and political debate. Nast's castigation of the Tweed Ring, Walt McDougall's characterization of Presidential candidate James G. Blaine's banquet with the millionaires at Delmonico's as "The Royal

Feast of Belshazzar," and numerous other efforts have undoubtedly had an effect on the course and outcome of contemporaneous debate. Lincoln's tall, gangling posture, Teddy Roosevelt's glasses and teeth, and Franklin D. Roosevelt's jutting jaw and cigarette holder have been memorialized by political cartoons with an effect that could not have been obtained by the photographer or the portrait artist. From the viewpoint of history it is clear that our political discourse would have been considerably poorer without them.

Respondent contends, however, that the caricature in question here was so "outrageous" as to distinguish it from more traditional political cartoons. There is no doubt that the caricature of respondent and his mother published in Hustler is at best a distant cousin of the political cartoons described above, and a rather poor relation at that. If it were possible by laying down a principled standard to separate the one from the other, public discourse would probably suffer little or no harm. But we doubt that there is any such standard, and we are quite sure that the pejorative description "outrageous" does not supply one. "Outrageousness" in the area of political and social discourse has an inherent subjectiveness about it which would allow a jury to impose liability on the basis of the jurors' tastes or views, or perhaps on the basis of their dislike of a particular expression. An "outrageousness" standard thus runs afoul of our longstanding refusal to allow damages to be awarded because the speech in question may have an adverse emotional impact on the audience. See *NAACP* v. *Claiborne Hardware Co.*, 458 U. S. 886, 910 (1982) ("Speech does not lose its protected character . . . simply because it may embarrass others or coerce them into action"). And, as we stated in *FCC* v. *Pacifica Foundation*, 438 U. S. 726 (1978):

"[T]he fact that society may find speech offensive is not a sufficient reason for suppressing it. Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection.

For it is a central tenet of the First Amendment that the government must remain neutral in the marketplace of ideas." *Id.*, at 745–746.

See also *Street* v. *New York*, 394 U. S. 576, 592 (1969) ("It is firmly settled that . . . the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers").

Admittedly, these oft-repeated First Amendment principles, like other principles, are subject to limitations. We recognized in *Pacifica Foundation*, that speech that is "'vulgar,' 'offensive,' and 'shocking'" is "not entitled to absolute constitutional protection under all circumstances." 438 U. S., at 747. In *Chaplinsky* v. *New Hampshire*, 315 U. S. 568 (1942), we held that a State could lawfully punish an individual for the use of insulting "'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Id.*, at 571–572. These limitations are but recognition of the observation in *Dun & Bradstreet, Inc.* v. *Greenmoss Builders, Inc.*, 472 U. S. 749, 758 (1985), that this Court has "long recognized that not all speech is of equal First Amendment importance." But the sort of expression involved in this case does not seem to us to be governed by any exception to the general First Amendment principles stated above.

We conclude that public figures and public officials may not recover for the tort of intentional infliction of emotional distress by reason of publications such as the one here at issue without showing in addition that the publication contains a false statement of fact which was made with "actual malice," *i. e.*, with knowledge that the statement was false or with reckless disregard as to whether or not it was true. This is not merely a "blind application" of the *New York Times* standard, see *Time, Inc.* v. *Hill*, 385 U. S. 374, 390 (1967), it reflects our considered judgment that such a standard is necessary to give adequate "breathing space" to the freedoms protected by the First Amendment.

Here it is clear that respondent Falwell is a "public figure" for purposes of First Amendment law.[5] The jury found against respondent on his libel claim when it decided that the Hustler ad parody could not "reasonably be understood as describing actual facts about [respondent] or actual events in which [he] participated." App. to Pet. for Cert. C1. The Court of Appeals interpreted the jury's finding to be that the ad parody "was not reasonably believable," 797 F. 2d, at 1278, and in accordance with our custom we accept this finding. Respondent is thus relegated to his claim for damages awarded by the jury for the intentional infliction of emotional distress by "outrageous" conduct. But for reasons heretofore stated this claim cannot, consistently with the First Amendment, form a basis for the award of damages when the conduct in question is the publication of a caricature such as the ad parody involved here. The judgment of the Court of Appeals is accordingly

*Reversed.*

JUSTICE KENNEDY took no part in the consideration or decision of this case.

JUSTICE WHITE, concurring in the judgment.

As I see it, the decision in *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964), has little to do with this case, for here the jury found that the ad contained no assertion of fact. But I agree with the Court that the judgment below, which penalized the publication of the parody, cannot be squared with the First Amendment.

---

[5] Neither party disputes this conclusion. Respondent is the host of a nationally syndicated television show and was the founder and president of a political organization formerly known as the Moral Majority. He is also the founder of Liberty University in Lynchburg, Virginia, and is the author of several books and publications. Who's Who in America 849 (44th ed. 1986–1987).