DECISION
This civil action is before the Court on the motions of all defendants to strike the plaintiff's claims for punitive damages. The motions are made pursuant to the ruling of the Supreme Court in Palmisano v. Toth, 624 A.2d 314 (R.I. 1993). This Court must "test by an evidentiary hearing the propriety of a claim for punitive damages." Id., at 320. "The plaintiff may presentevidence in opposition to the motion sufficient to constitute aprima facie showing of his or her eligibility for punitive damages, which would be determined in accordance with our standards that the defendant acted so wilfully, maliciously or recklessly as to amount to conduct bordering on criminality. (Citation omitted.) The defendant may cross-examine witnesses and may introduce evidence that tends to negate the showing made by the plaintiff. At the conclusion of the hearing, the justice willdetermine in accordance with our holding in Morin whether theevidence presented as a matter of law and fact warrants submission to a trier of fact (either judge or jury) of the punitive-damage issue." (Emphasis supplied.) Id., at 320-21. This Court's ruling is expressly made subject to review by a discretionary writ of certiorari.
Although some argument is made that the motion is akin to a motion for partial summary judgment under Rule 56, actually it is more like a motion for judgment as a matter of law under Rule 50 (a). The decision of the Court on a motion like this becomes the "law of the case," since it is based on an evidentiary showing by both parties and a determination by this Court as a matter of lawand fact. The parties have some concern that evidentiary rulings also become part of `the law of the case,' or that they may be estopped from objecting at trial to evidence if they waived objection at the hearing. During colloquy in the course of hearing this Court ruled that any waiver of objection to the admissibility of evidence at hearing would not bind that party at trial. That ruling is also now part of "the law of the case."
I
According to the evidentiary record in this case, the Court finds the following facts to have been proved by a fair preponderance of the competent credible evidence:
1. In 1987 the plaintiff consulted the defendant Richard Millman, M.D., for diagnosis and treatment of a sleep disorder known as sleep apnea. Doctor Millman performed a sleep study of the plaintiff at the defendant Rhode Island Hospital. The study consisted of attaching electrodes to the plaintiff's head to monitor brain wave activity. A videotape record was made of the plaintiff sleeping in a room in the defendant Rhode Island Hospital's sleep clinic.
2. The videotape recorded the plaintiff's movements and sounds while sleeping. The plaintiff was shown to roll fitfully in bed, to grunt, snort, and wave his hands and arms. His thrashing about sometimes deranged the electrodes.
3. In January 1990 the defendant Rhode Island Hospital issued a press release to the media, including Channel 12, a television broadcast station owned and operated by defendants Narragansett Television. L.P. and its general partner Narragansett Television, Inc., and which employed defendants Deborah Ferraro, John Woodin and Walter Cryan. In that release the defendant Rhode Island Hospital suggested as a topic of newsworthy interest that media representatives might, "Visit the all-night sleep lab at Rhode Island Hospital (one of a very few in New England) to observe a sleep study."
4. On February 5, 1990, the defendant Deborah Ferraro, a reporter employed by Channel 12, visited the sleep clinic where she interviewed the defendant Richard Millman, M.D. She asked Dr. Millman if he had a videotape of sleeping patients who suffered from sleep apnea. He selected a videotape which contained a number of sleep events, including the plaintiff's, at the clinic and handed it over to Ms. Ferraro.
5. Doctor Millman told Ms. Ferraro that, if she used any portion of the tape, she must either blot out the patient's face electronically or show only any patient who would not be identifiable. Doctor Millman had no idea at the time whose medical information he was releasing to Ms. Ferraro.
6. Ms. Ferraro agreed that either the patient's face would be electronically blotted out or that she would use only that portion of the tape on which the patient was not identifiable. Relying entirely on Ms. Ferraro's promise, the defendant physician and hospital transferred confidential medical information to Ms. Ferraro for broadcast.
7. Ms. Ferraro was unable to apply technology to blot out the patient's face. She then decided to use a portion of the tape which showed the plaintiff, but which she believed showed an unidentifiable patient.
8. The portions of the tape broadcast as "teasers," or "teases," at around 10:00 p.m. on the evening of February 6, 1990, were selected by some employee of the station other than Ms. Ferraro.
9. The "teasers," of which there were at least two, showed the plaintiff suffering from sleep apnea. He was seen to be gesticulating, snorting and choking.
10. The plaintiff called Channel 12 and spoke to defendant Walter Cryan, the anchor for the eleven o'clock news telecast, which the "teasers" were promoting. He told Mr. Cryan that he had not given the station permission to use the tape. After communicating with defendant John Woodin, the station's news director, Mr. Cryan viewed the tape and determined that in his opinion the plaintiff was not identifiable and would not be recognized. In spite of the plaintiff's persistent requests otherwise, the videotape was nonetheless broadcast.
11. The videotape as broadcast both as a "teaser" and as part of the eleven o'clock news telecast shows the plaintiff, who is clearly identifiable to people who know him and recognizable generally, in the throes of sleep apnea.
II
Our law regarding punitive damages is rife with linguistic difficulties. Courts are called on to apply to a variety of factual situations such abstract concepts as are embodied in words like "wilfulness, recklessness or wickedness" and "criminality" and "malice" and "bad faith" from Sherman v.McDermott, 114 R.I. 107, 108 (1974), quoted in Palmisano v. Toth,624 A.2d 314, 318 (R.I. 1993) and in Soares v. Ann Hope,637 A.2d 339, 351 (R.I. 1994). What can be gleaned from these words is that clearly only a limited kind of harmful conduct will subject an actor to punitive damages, at least at common law. None of these words provide us with so-called bright-line definitions, but they do help us distinguish behavior which clearly does not merit such an award from that which clearly does. Behavior which lacks any purposeful state of mind is clearly eliminated.
The problem is that, except in the case of an extremely deranged person, all behavior results from some mental direction. As a consequence, courts must deal with degrees of mental control and direction. Some purposes are punishable. Some are not. In a decent society, members have a right to know which is which.
And so, we are mired in mixed signals. At least with reference to what we call common law intentional torts. Since not every person liable for an intentional tort is liable for punitive damages, the state of mind called "intentional" standing alone will not suffice to support such an award.
It is not enough that an actor engaged in intentional conduct which resulted in liability for the tort. In order for a plaintiff to recover punitive damages it would appear that the actor must have engaged in the conduct for the purpose of inflicting actual harm to the victim. At least that is so at common law. As a result courts can speak of "wickedness," or "malice," plainly importing moral values into the tort damage process. We can also speak of "the good of society," when justifying an award of "exemplary" damages.
The notion of "recklessness" adds an even murkier concept to the kinds of state of mind of an actor which permit the assessment of punitive damages. The boundary between negligence and recklessness is perceptible only to a fact-finder on a case-by-case basis, and close calls are settled by the fact-finder. Once again the focus is not on the blameworthiness of the conduct, itself, but on the mental attitude of the actor with respect to the consequences of the wrongful conduct. Mere indifference to foreseeable harmful consequences to a plaintiff will not support an award of punitive damages. A knowing and deliberate disregard of the objectively substantial certainty of those consequences will suffice. At least at common law.
III
With respect to the conduct of Richard Millman, M.D., and Rhode Island Hospital (hereinafter referred to as "the health care defendants"), the Court is satisfied on the basis of the record before it that both of them acted with such wanton and wilful disregard of the substantially certain harm which would befall this plaintiff by their release of confidential information regarding his health care that their conduct can fairly be described as reckless enough to justify allowing a jury to award punitive damages. The conduct of these defendant as shown by the evidence was not only expressly and explicitly forbidden by law, but they, of all people, had to be fully aware of the harmful consequences to the plaintiff by their unlawful release and transfer of his unprotected and unredacted health care information to an unauthorized third party, especially to a media television reporter. Their pointless, and futile as it turned out, efforts to protect their patient's confidentiality may well be factors to be considered by the fact-finder in its ultimate determination of whether or not to award punitive damages, but it is not sufficient to keep the issue from the fact-finder, as a matter of law.
Furthermore, as health care providers, the defendant physician and the hospital were each the direct subjects of the Confidentiality of Health Care Information Act ("CHIA"), G.L.1956 (1995 Reenactment) §§ 5-37.3-1, et seq. They are both health care providers, as defined by the CHIA. The prohibition in § 5-37.3-4 (a) against unconsented release or transfer of a patient's confidential health care information must be most immediately applied to the patient's own providers. Section5-37.3-9 (a) provides that:
 "Anyone who violates the provisions of this chapter may be held liable for actual and exemplary damages."
Exemplary damages is simply another way of saying punitive damages. Read literally the health care defendants, who have violated § 5-37.3-4 (a) of the chapter, may be held liable for punitive damages.
The subsection has no culpability standard. The General Assembly, the ultimate arbiter of who should be punished "for the good of society" in this State, has spoken clearly with respect, at least, to health care providers. These defendants argue, nonetheless, that in the absence of any statutory standard of culpability this Court ought to construe the statute to require the same degree of culpability as is required in the case of common law torts. See BMW of North America. Inc. v. Gore, 517 U.S. ___, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). They point out that G.L. 1956 (1994 Reenactment) § 12-7-14, one example of a statute, which authorizes punitive damages, for the torts of false arrest and false imprisonment, simply codifies the common law. There any requirement of malice is implicit in the torts themselves. Likewise, they say, the statutory provision for punitive damages in this case must import the common law requirement of malice in the sense of personal ill-will.
They are clearly mistaken. The Supreme Court in Soares v. Ann Hope, supra, held that the statute, alone, was sufficient grounds to submit the issue of punitive damages to the jury in a false imprisonment case. As to the malicious prosecution claim, however, the Supreme Court was not so categorical, even though that tort, too, requires common law "malice," or lack of legal justification, usually good faith reasonable belief, as one of its elements. As to that tort the Supreme Court found that the requisite degree of culpability was shown by the evidence to entitle the plaintiff to have the issue of punitive damages submitted to the jury.
Section 5-37.3-9 (a) is only one of several statutory provisions like § 12-7-14 which authorize punitive damage awards without any express moral culpability standard. See, forexample: § 6-13.1-5.2 (Deceptive trade practices); §6-36-11 (Anti-trust); § 19-14.1-9 (b) (Lenders and loan brokers); § 23-19.14-16 (Industrial property remediation). In these cases the General Assembly has made a moral decision where the courts could not, or would not, under well-established common law standards.
The health care defendants had more than adequate notice of the standard they were expected to meet. Even if their conduct had been inadvertent or unintentional, if it had been their conscious and knowing conduct, they are liable under the statute without fault. The statute creates a form of strict liability for punitive damages. The amount of such damages must, nevertheless, respond to the degree of blameworthiness attached to the particular defendant's conduct.
It can be argued with considerable merit that the civil sanctions in § 5-37.3-9 (a) ought to be read in conjunction with the criminal sanction in § 5-37.3-9 (b) immediately following. It is said that if it is necessary to construe an otherwise ambiguous provision in a legislative enactment, the Court may consider that provision in the context of the entire enactment. See Sorenson v. Colibri Corp., 650 A.2d 125, 128-29 (R.I. 1994). It requires no legal realistic dexterity to slide the standard of "knowing and intentional" from the penal criminal sanction in subsection (b) to the otherwise standardless civil punitive sanction in subsection (a). The legal formalist, of course, would point out that by specifically including a standard in subsection (b) and obviously omitting one in subsection (a) the legislative intent was to omit any standard in subsection (a).
In this case with respect to the health care defendants no problem of statutory construction arises. Their conduct satisfies the common law standard of criminal recklessness. It obviously would satisfy the "knowing-and-intentional" standard of §5-37.3-9 (b), if it needs to be imported into § 5-37.3-9 (a).
Accordingly, the motions of the defendants Richard Millman, M.D., and Rhode Island Hospital to strike the plaintiff's claim in Counts V and VI of the complaint for punitive damages for violations of the CHIA are denied. The ruling is based on this Court's finding after evidentiary hearing that a prima facie case for punitive damages exists, which, if presented at trial, will entitle the plaintiff to have the question of an award of punitive damages against these defendants submitted to and considered by the ultimate fact-finder.
IV
In a post-hearing communication to the Court, the plaintiff suggests he may be entitled to punitive damages on his other claims. That suggestion was not argued in his written memorandum nor was it urged during oral argument. Further, in Counts XI and XII of his complaint, which claim damages against the health care defendants for violations of G.L. § 9-1-28.1 (a)(1) and (3) as breaches of his right of privacy, he did not specifically claim punitive damages. The same is true with respect to Counts XVII and XVIII, in which he seeks damages from these defendants for the tort of intentional infliction of emotional distress.
It is clear that the plaintiff cannot be entitled to punitive damages for mere negligence as alleged in Counts XIX and XX as a claim for damages against these defendants.
First, with respect to the breach of privacy claims against the health care providers under various subsections of §9-1-28.1, the Court notes that these are statutory torts and are not recognized in the common law of Rhode Island. Kalian v.People Acting Through Community Effort, Inc. (PACE),122 R.I. 429, 408 A.2d 608 (1979). The statute not only created the right to relief for a violation of the rights protected by the statute it also prescribed the nature of the relief to which an injured party was entitled in § 9-1-28.1 (b). The defendants are "liable" to the plaintiff in an action at law for a violation of the rights protected. The Court is permitted to award reasonable attorneys' fees and costs to a prevailing party. If the General Assembly had intended to permit the Court to award punitive damages, in addition, it would have said so.
The omission is particularly pertinent because no standard of culpability is attached to liability. A party is liable if that party subjects any person or causes any person to be subjected to a violation of a right to privacy as defined by the statutes. That liability is strict. Reasonableness standards pertain to the violations, themselves, not to the conduct of the defendant charged with the violation. If the General Assembly wanted to impose punitive damages for culpable violations of the act, it would have done so and provided the courts with a standard.
In the second place, there was no evidence presented that the health care defendant violated any provision of § 9-1-28.1 in wilful and wanton disregard of the harm the plaintiff would suffer from the violation of his privacy. In that sense, the plaintiff has failed to show that there is evidence from which it can be shown that these defendants were so recklessly indifferent to the harm, which would befall the plaintiff as a consequence of their release and transfer of the videotape of the television reporter, as to characterize their conduct as malicious.
The claims of punitive damages implicit in Counts XI and XII, if any, will be stricken.
So far as the counts alleging intentional infliction of emotional distress by the health care defendants are concerned, this Court is doubtful, on the basis of the evidence presented at this hearing, whether these counts will survive a Rule 50 motion.See, Champlin v. Washington Trust Co. of Westerly, 478 A.2d 985, 988 (R.I. 1984); Restatement Torts (Second) § 46 (1965). This Court is doubtful that the conduct of these defendants can fairly be labeled "extreme and outrageous," especially in light of their attempts, albeit futile, to restrict the broadcast of the private health information in their custody.
Under these circumstances, the Court must grant the defendants' motions to strike any implicit claim for punitive damages in Counts XVII and XVIII.
V
The media defendants: Narragansett Television, L.P.; Narragansett Television, Inc. (Channel 12); Deborah Ferraro; John Woodin and Walter Cryan; present special problems because of the protection the First Amendment to the Constitution of the United States accords to their activity. The health care defendants in this case assert no free speech right to release the videotape of the plaintiff to the media defendants. The media defendants, on the other hand, vigorously assert that allowing a claim for punitive damages in this case will violate their First Amendment right to publish truthful information in which there is a clear public interest.
Each media defendant is alleged to have violated G.L. §9-1-28.1 (a)(1), which protects the rights of individuals to be secure from unreasonable intrusion upon one's physical solitude or seclusion, by displaying the videotape of his sleep disorder. The media defendants correctly point out that there is no way in which their conduct constitutes an intrusion. They did not witness his troubled sleep nor did they record it for any purpose, let alone broadcast it live on a commercial television newscast. Nevertheless, the facts shown by the evidence presented at the hearing do disclose that there is a likely claim for damages for a violation of § 9-1-28.1 (a)(3), the right to be secure from unreasonable publicity given to one's private life.
This Court does not need to consider whether the "newsworthiness" of this videotaped event is so far protected by the defendants' First Amendment rights that the plaintiff's "right to privacy" must yield. Neither § 9-1-28.1 (a)(1) nor § 9-1-28.1 (a)(3) provides a basis for any award of punitive damages against any defendant in the absence of an express legislative mandate, since both rights to relief are legislatively created and neither is derived from the common law.
Accordingly, the motions to strike any implicit claims of punitive damages in Counts VII, VIII, IX and X of the complaint are granted.
VI
With regard to the counts which allege that each of the media defendants intentionally inflicted emotional distress on the plaintiff, assuming the plaintiff implicitly claims punitive damages for this tortious conduct, a somewhat different analysis from that of the claims against the health care defendants is required. In Rhode Island liability for the tort of intentional infliction of emotional distress is recognized at common law.Champlin v. Washington Trust Co. of Westerly, supra. In that case § 46 of Restatement of Torts (Second) was recognized by the Court as part of the common law of this State. The basis for that liability is the extreme and outrageous conduct of the defendant. Nevertheless, in Rhode Island, in order to recover damages for that tort, a plaintiff must allege and prove physical symptomatology as a result of the emotional distress. No such requirement exists in other intentional torts involving personal injuries, such as assault, battery or false imprisonment, for example. In that sense the tort is a suspect one under our law, since it requires a special showing even before liability can be established.
The question remains whether the tort can be committed with such enhanced culpability as to entitle a plaintiff to punitive as well as compensatory damages. Also to be considered is whether or not the media defendants, or any of them, can be exposed to liability for publishing truthful information, albeit embarrassing, about the plaintiff, without any personal ill will or animus toward the plaintiff.
If the basis for recovery is the extreme and outrageous nature of the defendant's conduct, should not every defendant, who is at all liable, be liable for punitive damages? Is not "extreme," after all, an absolute? Can any tortious conduct be worse than "extreme"? All this Court can discern that could heighten liability, so that punitive damages can be assessed, would be if the extreme and outrageous conduct is motivated by malice in sense of personal animus directed particularly at the plaintiff. In this kind of case, the defendant must be specially motivated to hurt the plaintiff, or the defendant must know that his or her otherwise outrageous conduct will hurt the particular plaintiff.
This Court is encouraged to the view that personal animosity or ill will, including spiteful indifference, is required for the imposition of punitive damages against media defendants by the unanimous opinion of the United States Supreme Court in HustlerMagazine v. Falwell, 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988). In that case the tort of intentional infliction of emotional distress, as embodied in Restatement Torts (Second) § 46, could not survive First Amendment scrutiny when applied to media publication in a parody of advertising of outrageous assertions regarding a public figure. The Supreme Court speaking through the Opinion of Chief Justice Rhenquist said:
 "Respondent contends, however, that the caricature in question here was so `outrageous' as to distinguish it from more traditional political cartoons. There is no doubt that the caricature of respondent and his mother published in Hustler is at best a distant cousin of the political cartoons described above, and a rather poor relation at that. If it were possible by laying down a principled standard to separate the one from the other, public discourse would probably suffer little or no harm. But we doubt that there is any such standard, and we are quite sure that the pejorative description `outrageous' does not supply one. `Outrageousness' in the area of political and social discourse has an inherent subjectiveness about it which would allow a jury to impose liability on the basis of the jurors' tastes or views, or perhaps on the basis of their dislike of a particular expression. An `outrageousness' standard thus runs afoul of our long-standing refusal to allow damages to be awarded because the speech in question may have an adverse emotional impact on the audience." Id., 485 U.S., at 55, 108 S.Ct., at 881-82, 99 L.Ed.2d, at 51-52.
It is true that the plaintiff in Hustler was and is a public figure. The plaintiff here is clearly not, nor did he inject himself into a public issue. It is true that the publication inHustler was obviously not intended to be literally believed. In our case the publication is conceded to be true. Nevertheless, the offensiveness of the two publications differ in severity by several orders of magnitude. Display of the plaintiff's tormented sleep in our case is far less objectively offensive than the parodic assertion that an otherwise reputable clergyman "did it" for the first time with his mother. Yet, the injured plaintiff inHustler was turned away without even compensatory, let alone punitive, balm for his injured sensibilities. "Outrageousness", alone, is not enough to overcome First Amendment protection in the arena of "political" discourse. It may well not be enough to avoid its shield in that of private exposure.
With those considerations in mind, the Court is satisfied that, although Deborah Ferraro's conduct in failing to assure that the plaintiff's identity would be concealed, notwithstanding her solemn professional journalistic commitment, is a reckless disregard of the plaintiff's privacy interests, her conduct does not display any personal spite or ill will to the plaintiff. The same is true of Walter Cryan, who was specifically requested by the plaintiff, not to repeat the display of the plaintiff's grossly disturbed slumber in a regular news broadcast, after the plaintiff had viewed it during an earlier "teaser" promotion for the later news show. His conduct is not only recklessness, but blatant indifference to the invasion of plaintiff's privacy. He makes no claim that he did not or could not control the contents of the night's newscast. He does not assert that he is merely a performer who has no control over the script he reads. Nonetheless, the Court is satisfied that his conduct falls short of that degree of desire to inflict harm on the plaintiff which will subject him to punitive damages.
So far as John Woodin, the producer of the broadcast, is concerned, while he did have control over the content of the broadcast, there is no showing that he had any intent to harm the plaintiff personally. Under the circumstances it is difficult to make out how he will be liable at all for any damages, let alone for punitive damages, for his conduct in producing the teasers or the eventual news broadcast.
The claims against Narragansett Television, L.P., and Narragansett Television, Inc., are based on the doctrine ofrespondeat superior. These defendants are liable, if at all, as the employers of Ferraro, Cryan, Woodin, or of any other employee of the station, who controlled the broadcasts which are alleged to have violated the plaintiff's privacy. Under those circumstances punitive damages may be awarded only if the employer participated in, authorized or ratified the tortious conduct of its employees. AAA Pool Service Supply, Inc. v.Aetna Casualty and Surety Company, 479 A.2d 112, 116 (R.I. 1984). In the absence of any such showing in the evidence presented at this hearing, neither of these defendants can be liable for punitive damages.
Accordingly, the claims for punitive damages against the media defendants in Counts XIII, XIV, XV and XVI will be stricken, and the motions granted.
VII
There remains, finally, the question of whether or not the media defendants are liable for punitive damages for violation of CHIA. First, the Court must decide whether these defendants are subject to any provision of CHIA at all. Then, the Court must decide whether the defendants have so violated the Act as to be liable for punitive damages. Finally, if the defendants would be otherwise liable for punitive damages, do they have a First Amendment shield?
Read literally § 5-37.3-9 (a) plainly applies to each of these defendants. "Anyone" means anyone. None of these defendants claims to be no one. Some of them make a living by being someone. The conduct prohibited in § 5-37.3-4 (a), as well, is not limited to conduct engaged in solely by health care providers. Grammatically the subsection is phrased in a passive voice: "A patient's confidential health care information shall not be released or transferred" by anyone.
One of the specific exceptions to the prohibition in subsection (a) is contained in current subsection (b)(22) (in 1990 part of subsection (b)(19)): "A hospital may release the fact of a patient's admission and a general description of a patient's condition to persons representing themselves as relatives or friends of the patient or as a representative of the news media." This exception is the sole recognition of the news media's interest in confidential health care information.
It is also noteworthy that § 5-37.3-4 (a) was amended in 1996 to incorporate civil and criminal sanctions for violations, but without an express repealer of § 5-37.3-9. Like §5-37.3-9, the amended provisions of § 5-37.3-4 (a) seem to permit an award of punitive damages on a strict liability basis. The criminal penalties may be imposed for knowing and intentional violations. Civil penalties, including actual and punitive damages, may be imposed for any violation.
As the Court has pointed out with respect to the health care provider defendants, the problem of due process prior notice requirements for the imposition of penalties under Gore can be satisfied by importing into the provision for punitive damages either a common law standard of personal malice or the criminal liability standard of knowing and intentional conduct. It is all the more important that with respect to the media defendants there must be a reasonably well-defined standard for the imposition of any damages, let alone punitive damages, because of First Amendment constraints. The Florida Star v. B.J.F., 491 U.S. 524, 539-40, 109 S.Ct. 2603, 2612, 105 L.Ed.2d 443, 459 (1989);Gertz v. Robert Welch Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). Clearly, under well-established doctrine in this State mere negligence will not suffice to support an award of punitive damages.
This Court is satisfied that the "knowing-and-intentional" standard of culpability in § 5-37.3-9 satisfies the First Amendment requirement as well as any due process constitutional requirements. The analytical problem arises from the questions of who must know what and what must that person intend before punitive damages may be imposed.
The evidence is sufficient to support the conclusion that the defendant Ms. Ferraro knew that the videotape was somehow protected confidentiality with respect to the identity of the subjects portrayed. There is no evidence that she was aware of the Act, but she was conscious of an obligation to protect the identity of the persons portrayed. The evidence supports the conclusion that she "knowingly" violated the Act when she turned the videotape over to a producer at the station for broadcast on the late evening newscast. But, was her conduct "intentional"? Did she "intend" for the plaintiff's identity to be disclosed? The evidence is equally clear that she did not. The evidence is that she did everything she reasonably could to avoid publicizing the plaintiff's identity. The fact that her efforts were unavailing may support a claim in negligence for compensatory damages, but, standing alone, that fact is not evidence that she intended to violate the Act.
The fact that she may have violated some kind of journalistic ethical constraint by not preserving confidentiality in accordance with some kind of "deep throat" promise is not the equivalent of an intentional disclosure of protected information. Her failure to keep her commitment may have some relation to a claim by the health care defendants for contribution, but that cannot be the basis for an assessment of punitive damages by the plaintiff against the media defendants. Her motion to strike will be granted.
The defendant Walter Cryan is in a different position from that of Ms. Ferraro. It is clear that he was called by the plaintiff after the "teasers" were aired and was advised that the plaintiff, who was the subject of the videotape, was identifiable and identified. Mr. Cryan called the news director, the defendant Mr. John Woodin, who advised Mr. Cryan to check to make sure the plaintiff's concerns were unfounded because the subject of the tape was not identifiable. The evidence is clear that he "knew" that the station was about to broadcast confidential information. There is no evidence that he knew about the Act, but it is clear that the station was about to broadcast matter for which it should have had consent. There is no evidence in this record that he gave heed to Mr. Woodin's admonition to review the videotape himself.
But knowledge of the protected status of the plaintiff's identity by Mr. Cryan alone will not suffice to expose him to punitive damages under the Act. His conduct must have been both knowing and intentional. His exposure of the plaintiff's sleep apnea to the viewers of Channel 12 was plainly intentional. He did nothing to prevent the exposure. He cannot escape liability for his knowing and intentional conduct. His motion to strike the claim for punitive damages must be denied.
Although Mr. John Woodin had the power to decide not to publicize the plaintiff's confidential health care information, he relied entirely and justifiably on defendant Walter Cryan's assessment. Based on the communication from Mr. Cryan, he is chargeable with knowledge that protected information was about to be broadcast. His knowledge, however, does not rise to the level of that of Ms. Ferraro. He responded reasonably, if ineffectively, to the problem communicated to him by Mr. Cryan. He did not intend to violate the Act. His motion to strike will be granted.
The claims against Narragansett Television, L.P., and Narragansett Television, Inc., are based entirely on the doctrine of respondeat superior. A principal is liable for punitive damages only where it ratifies, authorizes or participates in the wrongful conduct of its agent. Reccko v. Criss Cadillac Co.,Inc., 610 A.2d 542, 544-45 (R.I. 1992). There is no evidence whatever that any managing officer or general partner of either principal entity had any knowledge of the actions of Ms. Ferraro and Mr. Cryan. Mr. Cryan's broadcast was not reviewed by any management person other than Mr. Woodin, who had no actual knowledge that the plaintiff's confidential medical information would be broadcast. There is no evidence that the management of Channel 12 knowingly and intentionally participated in Mr. Cryan's wrongful conduct. Their motion must be granted.
To recapitulate: The motion to strike the claim for punitive damages will be granted as to Counts I, II, III, VII, VIII, IX, X, XI, XII, XIII, XIV, XV, XVI, XVII, XVIII, XIX and XX of the plaintiff's amended complaint. The motion to strike will be denied as to Counts IV, V and VI of the plaintiff's amended complaint.