Concord District Court
No. 2001-492

THE STATE OF NEW HAMPSHIRE

v.

YVONNE ALLARD

Argued: October 16, 2002
Opinion Issued: December 18, 2002

*Philip T. McLaughlin*, attorney general (*Susan P. McGinnis*, attorney, on the brief and orally), for the State.

*Backus, Meyer, Solomon, Rood & Branch LLP*, of Manchester (*Jon Meyer* on the brief and orally), for the defendant.

DUGGAN, J. Following a bench trial in the Concord District Court (*Robbins*, J.), the defendant, Yvonne Allard, was convicted of giving a false report to law enforcement, RSA 641:4, I (1996). On appeal, she raises five issues. First, she argues the evidence was insufficient to prove that her purpose in making the false statement was to induce a law enforcement officer to believe that another person had committed a crime. Second, she argues that to be convicted under RSA 641:4, the defendant must initiate the contact that leads to the false statement. Third, she argues that her conviction amounts to an unconstitutional infringement of her free speech rights. Fourth, she argues evidence of her false statement should be excluded because she did not receive *Miranda* warnings. Fifth, she argues, and the State agrees, that the court erroneously denied an *in camera* review of the internal memoranda prepared by the testifying officers. We reverse.

At the defendant's trial the following facts were elicited, mostly from the testimony of Concord police officers. On August 6, 2000, at approximately 4:40 a.m., the Concord Police Department arrested Charles Anzaldi, the defendant's boyfriend and father of her infant son, for disorderly conduct and resisting arrest. Sergeant John Brown, Officer William Brouillet, and Officer James Walgreen responded to a neighbor's complaint of a disturbance at the defendant's apartment. When the officers arrived, the defendant let them into her apartment where they found Anzaldi in the living room. Anzaldi became irritated, denied that there was any disturbance and told the officers to leave.

The arresting officers were required to use force when arresting Anzaldi. Officer Brouillet testified that he grabbed one of Anzaldi's arms or wrists while attempting to handcuff him. Officer Brouillet and Anzaldi then engaged in a physical struggle, ending up on the couch, where Brouillet forced Anzaldi's hands behind his back and handcuffed him with assistance from Sergeant Brown.

When the officers put Anzaldi in a police cruiser, Anzaldi kicked the rear passenger window until the glass shattered. Officer Walgreen then pulled Anzaldi out of the car, laid him face down on the ground and told him to calm down. With Anzaldi on the ground, Officer Walgreen placed his knee on one shoulder and Sergeant Brown placed his hand on the other shoulder, holding Anzaldi down. While the officers were holding Anzaldi on the ground, he went limp. The officers placed Anzaldi against a tree and called an ambulance. Anzaldi stared into space and fell over onto an officer's feet. The officers picked Anzaldi up and propped him against the tree. At this point, the defendant came out of the apartment, told the officers that Anzaldi suffered from a seizure disorder and asked to speak

with him. The officers testified that the defendant was upset, but cooperative.

John McBride, a paramedic with the Concord Fire Department, arrived shortly thereafter. McBride used an ammonia inhalant to revive Anzaldi. After a physical and neurological assessment, he found no injuries. Anzaldi was taken to the Concord Hospital emergency room where Dr. Russell Kay, who had twice previously treated Anzaldi and determined that he was faking unconsciousness and paralysis, examined Anzaldi for injuries, found none and released him to police custody.

An officer testified that as Anzaldi was being transported from the hospital to the Merrimack County House of Corrections, he deliberately hit his head twice against a divider in the police cruiser. Anzaldi's intake records from the house of corrections indicate that he had bruises over his left eye and his shoulder. Later that day, Anzaldi was admitted to Franklin Hospital where he remained for a couple of days. His admission records indicate that upon admission he suffered from multiple seizures.

Shortly after Anzaldi's arrest, the defendant contacted a *Concord Monitor* reporter and told the reporter that the arresting officers had used excessive force in arresting Anzaldi. The reporter investigated the defendant's claims by interviewing Concord Police Lieutenant George Pangakis. The reporter informed Pangakis that the defendant alleged that Anzaldi was in a coma at Franklin Hospital as a result of the arresting officers' use of excessive force. The *Monitor* subsequently published an article based upon the defendant's interview and the arresting officers' reports.

After the publication of the *Concord Monitor* article, Lieutenant Pangakis and Concord Police Sergeant Cross arrived, unannounced, at the defendant's apartment to question her regarding her statements to the reporter. In response to their questions, the defendant repeated the statements she had made to the reporter, *i.e.*, that she and her stepsister had witnessed the arresting officers hit Anzaldi on the cheek, drive his head into the corner of a table, and then kick him and beat him with batons.

The defendant answered all of the officers' questions but did not volunteer any information, name any specific police officer, or accuse any officer of committing any specific crime. When Pangakis asked the defendant why she had complained to the *Monitor* instead of the police department, she responded that "she didn't trust them." She also told Pangakis that she would not file a complaint but that she "want[ed] the badges from [sic] the police officers gone." Pangakis asked the defendant to give a written statement. After the interview, she consulted an attorney and never provided a written statement.

Lt. Pangakis then interviewed the defendant's stepsister, who corroborated the defendant's account of the arrest, as well as the superintendent of the jail, a neighbor, and the paramedics who treated Anzaldi at the scene. Based upon her statements to Pangakis, the defendant was charged with violating RSA 641:4, I. When she asserted her right to a jury trial, the State reduced the charge from a class A to a class B misdemeanor. After a bench trial, she was convicted and the maximum sentence, a $1,200 fine, was imposed.

We first address the defendant's claim that there was insufficient evidence that her purpose in giving the false statement was to induce law enforcement officers to believe that the arresting officers had committed an offense. "In an appeal challenging the sufficiency of the evidence, the defendant carries the burden of proving that no rational trier of fact, viewing the evidence in the light most favorable to the State, could have found guilt beyond a reasonable doubt." *State v. Dugas*, 147 N.H. 62, 66 (2001) (quotation and brackets omitted).

RSA 641:4, I (1996), entitled False Reports to Law Enforcement, provides that:

> A person is guilty of a misdemeanor if he:
>
> I. Knowingly gives or causes to be given false information to any law enforcement officer with the purpose of inducing such officer to believe that another has committed an offense . . . .

■ The mere act of giving false information to the police is insufficient to constitute an offense under this statute. The State must also prove that the defendant's purpose was to convince the police that another person committed an offense. *State v. Hill*, 146 N.H. 568, 574-75 (2001).

The defendant argues that her statements and acts demonstrate that her purpose was not to induce a law enforcement officer to believe the arresting officers committed a crime. The defendant cites the following statement from the trial court's order to support her argument:

> The question then remains, what was her purpose in lying to Pangakis and Cross? Was it because she did not trust the police and felt that lying to them would somehow protect her friend Anzaldi? Or did she lie to them in an attempt to put the officers at the scene of Anzaldi's arrest in such an evil light that it would be the police officers' actions and not Anzaldi's that would be the focus of future police, media and judicial scrutiny?

The State notes that the trial court also concluded that "the State has proven beyond a reasonable doubt that when [the defendant] spoke with

Pangakis and Cross about the events of 8/6/2000, she wanted them to believe that police officers under their command had done a 'Rodney King' on her friend Anzaldi by hitting him repeatedly with nightsticks as he lay handcuffed on the ground." The State argues that this finding constituted sufficient evidence of the defendant's purpose, if not her precise motive.

Our review of the evidence concerning the defendant's intent must be conducted in light of the right to criticize police conduct under the First Amendment of the United States Constitution and Part I, Article 22 of the New Hampshire Constitution. Because our State Constitution provides at least as much protection as the Federal Constitution, we decide this case under State law only, considering cases from the federal courts only as an analytical aid. *See Petition of State of New Hampshire (Bowman Search Warrants)* 146 N.H. 621, 624 (2001).

As the United States Supreme Court noted in *Houston v. Hill*, 482 U.S. 451, 461 (1987), "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." Indeed, "[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Id.* at 462-63.

The State cites *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339-40 (1974), and *State v. Kilgus*, 125 N.H. 739, 745 (1984), for the proposition that the State and Federal Constitutions do not protect intentionally false statements of material fact. *See also Keeton v. Hustler Magazine*, 131 N.H. 6, 19 (1988). Those cases, however, only stand for the proposition that important public interests may sometimes outweigh an individual's interest in expression when the speech involved has slight value. *See Gertz*, 418 U.S. at 339-40; *Kilgus*, 125 N.H. at 745.

■ We have never held that criticism involving intentionally false statements falls outside the protection of Part I, Article 22 of the New Hampshire Constitution. While false statements may have little value in and of themselves, "the real issue is whether that freedom of speech which all agree is constitutionally protected can be safeguarded by a rule allowing the imposition of liability" upon a court's determination that a statement is "false and maliciously motivated." *New York Times Co. v. Sullivan*, 376 U.S. 254, 300 (1964) (Goldberg, J., concurring); *see also Gertz*, 418 U.S. at 341 ("The First Amendment requires that we protect some falsehood in order to protect speech that matters."). In other words, the fear of being prosecuted under laws prohibiting false speech may deter the promulgation of valuable and protected speech. This concern is particularly acute in the context of allegations of police misconduct. As in this case, such allegations will often pit the word of a civilian eyewitness

against the testimony of several police officers. Moreover, these cases create a situation wherein the accused persons are members of the body responsible for investigating the complaint and filing charges. A literal application of RSA 641:4 may thus substantially deter citizens from exercising their right under the free speech guarantees of the United States and New Hampshire Constitutions to criticize police officers and report police misconduct, out of fear that they will face prosecution if the police do not believe them. *Cf. Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 52 (1988).

Our practice in prior cases has been to construe criminal statutes narrowly where the conduct involved implicates free speech rights. In *State v. Albers*, 113 N.H. 132, 135-36 (1973), we noted that the literal language of New Hampshire's then-existing "mob action" statute, which criminalized "the assembly of two or more persons to do an unlawful act," would outlaw peaceful assemblies for the purpose of undertaking unlawful civil acts, such as torts and contract breaches. To avoid conflict with free speech and assembly rights, we construed the statute to prohibit only assemblies made for the purpose of committing unlawful criminal acts. *Id.* at 136.

Similarly in *State v. Nickerson*, 120 N.H. 821, 823 (1980), the defendants were arrested for disorderly conduct for refusing "to comply with a lawful order of the police to move from a public place," as mandated by statute. Because the statute provided police with "unfettered discretion" to disperse and arrest peaceful protesters, we held that the statute was unconstitutional. *Id.* at 823-24. We noted that the language of the disorderly conduct statute was "set in general terms and can conceivably apply to a broad spectrum of . . . situations." *Id.* at 824 (quotation omitted). We stated that "[w]hen a statute threatens a fundamental right such as freedom of speech special judicial scrutiny is required." *Id.* (brackets and ellipses omitted).

█ Accordingly, we find that special scrutiny is necessary in evaluating the purpose requirement of RSA 641:4 when a defendant alleges police misconduct. In such a case, the State must offer evidence that the defendant's purpose in issuing her false report was to instigate a criminal investigation of a police officer's conduct. The State must prove that it was the defendant's "conscious object" to cause such an investigation. RSA 626:2, II(a) (1996). We believe this interpretation effectively balances the right of the individual to criticize police conduct with the State's interest in preventing the misdirection of police resources for the investigation of crime. *See* MODEL PENAL CODE § 241.5 comment 1 (Revised Comments 1980).

■ Applying special scrutiny to this case, we conclude that the evidence is insufficient to prove that the defendant's purpose was to induce a criminal investigation. The presence of a number of circumstances compels this decision. Of no small importance is the fact that the defendant's initial report was to a newspaper, rather than the police or the government. By seeking a public forum for her complaint, she demonstrated that the overarching purpose of her statements was to embarrass or discredit the police, and not to instigate a criminal investigation of the officers.

The defendant's conduct after making the statement to the newspaper further demonstrates her lack of purpose. At no point did the defendant seek out the police. Indeed, it was the police who contacted her by going to her residence, unannounced. When questioned, the defendant did not volunteer information, but essentially restated what she had already said to the newspaper reporter. She never accused any police officer by name, and never said that any police officer committed any specific crime. Despite repeated requests from the police, she never provided a written statement to the officers. She told the police that she did not trust them, and that she would not file a criminal complaint against the police department.

The State points to the defendant's statement that she "want[ed] the badges from the police officers gone" as evidence of the defendant's purpose. At most, however, this statement demonstrates that she hoped for an internal investigation of the officers that would lead to the loss of their jobs. RSA 641:4, however, only prohibits false reports of criminal offenses. *State v. Hill*, 146 N.H. at 575. It is not a violation of the statute to falsely report behavior with the purpose of instigating a work-related investigation of a police officer's professional conduct.

As the trial judge noted, there are numerous explanations for the defendant's statements. The defendant may have lied to protect her friend Anzaldi, to protect herself, or to criticize and embarrass the police. We certainly do not condone making false statements to accomplish these ends. However, because we find insufficient evidence to prove that the defendant's purpose was to instigate a criminal investigation of the police officers, her conviction under RSA 641:4, I, cannot stand. Because we reverse on this ground, we need not reach the other issues raised by the defendant.

*Reversed.*

BROCK, C.J., and NADEAU, J., concurred; DALIANIS, J., dissented.

DALIANIS, J., dissenting. The majority today holds that in furtherance of the constitutional protections afforded free speech under both the State

and Federal Constitutions, we must apply close scrutiny when interpreting RSA 641:4, I, so as not to criminalize protected speech. Because I believe the majority has effectively rewritten RSA 641:4, I, to include an element that is otherwise not present in the statute, I respectfully dissent.

RSA 641:4, I, provides that a person is guilty of a misdemeanor if he "[k]nowingly gives or causes to be given false information to any law enforcement officer with the purpose of inducing such officer to believe that another has committed an offense." The provisions of our State's Criminal Code are "construed according to the fair import of their terms and to promote justice." *State v. Hill*, 146 N.H. 568, 575 (2001) (quotations omitted); RSA 625:3 (1996). As a long-standing matter of statutory construction, we interpret statutory language in accordance with its common usage. *Hill*, 146 N.H. at 575. When statutory language is plain and unambiguous, we do not look beyond the statute for additional indications of legislative intent. *Id.* We will not add words that the legislature chose not to include. *State v. Hatt*, 144 N.H. 246, 247 (1999).

The majority posits that a literal interpretation of RSA 641:4, I, may deter citizens from exercising their rights under the free speech guarantees of the United States and New Hampshire Constitutions to criticize police officers and report police misconduct out of fear that they will be prosecuted because law enforcement does not believe them. As a result, the majority holds that to obtain a conviction under RSA 641:4, I, the State must establish that the defendant knowingly gave false information to a law enforcement official with the purpose of instigating a criminal investigation into the person's misconduct.

I do not subscribe to the majority's construction of RSA 641:4, I. The statute is clear that a person is guilty if he or she knowingly provides false information with the purpose of inducing a law enforcement official to believe that someone has committed an offense. Surely, if the legislature had intended to limit the purpose requirement of the statute to what the majority contends, it could have done so explicitly. Absent a consideration of the statute's legislative history, however, I fail to see how this court can presume legislative intent that is otherwise not clear from the plain language. *Cf. State v. Albers*, 113 N.H. 132, 135-36 (1973) (considering legislative history of RSA 609-A:1, II (Supp. 1972) when interpreting phrase "unlawful act"). Moreover, even assuming that today's reading of the statute is sanctioned by the legislature, I disagree that this construction lends further protection to those citizens who would otherwise criticize police officers and report police misconduct that they believe is truthful.

Nevertheless, under either interpretation of RSA 641:4, I, I believe that there was sufficient evidence to convict the defendant of providing false

information to law enforcement. "When reviewing the sufficiency of the evidence, we ask whether, based upon all the evidence and all reasonable inferences from it, when considered in a light most favorable to the State, any rational trier of fact could have found beyond a reasonable doubt that the defendant was guilty." *State v. Clyde*, 145 N.H. 388, 389 (2000) (quotations omitted). Here, when confronted by police regarding her statements to the newspaper, the defendant, rather than retracting those statements or making no comment at all, confirmed her previous statements. In addition, she told the officers that she "want[ed] the badges from the officers gone."

Considering these facts in the light most favorable to the State, a rational trier of fact could conclude beyond a reasonable doubt that the defendant gave the police false information with the purpose of inducing police to believe that another person has committed an offense. RSA 641:4, I. Further, even under the majority's reading of the statute, a rational trier of fact could conclude beyond a reasonable doubt that the defendant provided this information for the purpose of generating a criminal investigation.

Based upon the foregoing, I respectfully dissent.