Justice Alito,
with whom Justice Scalia and Justice Thomas join, dissenting.
Only the bravest of the brave are awarded the Congressional Medal of Honor, but the Court today holds that every American has a constitutional right to claim to have received this singular award. The Court strikes down the Stolen Valor Act of 2005, which was enacted to stem an epidemic of false claims about military decorations. These lies, Congress reasonably concluded, were undermining our country’s system of military honors and inflicting real harm on actual medal recipients and their families.
Building on earlier efforts to protect the military awards system, Congress responded to this problem by crafting a narrow statute that presents no threat to the freedom of speech. The statute reaches only knowingly false statements about hard facts directly within a speaker’s personal knowledge. These lies have no value in and of themselves, and proscribing them does not chill any valuable speech.
By holding that the First Amendment nevertheless shields these lies, the Court breaks sharply from a long line of cases recognizing that the right to free speech does not protect false factual statements that inflict real harm and serve no legitimate interest. I would adhere to that principle and would thus uphold the constitutionality of this valuable law.
*740 I
The Stolen Valor Act makes it a misdemeanor to “falsely represent” oneself as having been awarded a medal, decoration, or badge for service in the Armed Forces of the United States. 18 U. S. C. § 704(b). Properly construed, this statute is limited in five significant respects. First, the Act applies to only a narrow category of false representations about objective facts that can almost always be proved or disproved with near certainty. Second, the Act concerns facts that are squarely within the speaker’s personal knowledge. Third, as the Government maintains, see Brief for United States 15-17, and both the plurality, see ante, at 719, and the concurrence, see ante, at 732 (Breyer, J., concurring in judgment), seemingly accept, a conviction under the Act requires proof beyond a reasonable doubt that the speaker actually knew that the representation was false.[1] Fourth, the Act applies only to statements that could reasonably be interpreted as communicating actual facts; it does not reach dramatic performances, satire, parody, hyperbole, or the like.[2] Finally, the Act is strictly viewpoint neutral. The *741 false statements proscribed by the Act are highly unlikely to be tied to any particular political or ideological message. In the rare cases where that is not so, the Act applies equally to all false statements, whether they tend to disparage or commend the Government, the military, or the system of military honors.
The Stolen Valor Act follows a long tradition of efforts to protect our country’s system of military honors. When George Washington, as the commander of the Continental Army, created the very first “honorary badges of distinction” for service in our country’s military, he established a rigorous system to ensure that these awards would be received and worn by only the truly deserving. See General Orders of George Washington Issued at Newburgh on the Hudson, 1782-1783, p. 35 (E. Boynton ed. 1883) (reprint 1973) (requiring the submission of “incontestible proof” of “singularly meritorious action” to the Commander in Chief). Washington warned that anyone with the “insolence to assume” a badge that had not actually been earned would be “severely punished.” Id., at 34.
Building on this tradition, Congress long ago made it a federal offense for anyone to wear, manufacture, or sell certain military decorations without authorization. See Act of Feb. 24, 1923, ch. 110, 42 Stat. 1286 (codified as amended at 18 U. S. C. § 704(a)). Although this Court has never opined on the constitutionality of that particular provision, we have said that § 702, which makes it a crime to wear a United States military uniform without authorization, is “a valid statute on its face.” Schacht v. United States, 398 U. S. 58, 61 (1970).
Congress passed the Stolen Valor Act in response to a proliferation of false claims concerning the receipt of military awards. For example, in a single year, more than 600 Virginia residents falsely claimed to have won the Medal of *742 Honor.[3] An investigation of the 333 people listed in the online edition of Who’s Who as having received a top military award revealed that fully a third of the claims could not be substantiated.[4] When the Library of Congress compiled oral histories for its Veterans History Project, 24 of the 49 individuals who identified themselves as Medal of Honor recipients had not actually received that award.[5] The same was true of 32 individuals who claimed to have been awarded the Distinguished Service Cross and 14 who claimed to have won the Navy Cross.[6] Notorious cases brought to Congress’ attention included the case of a judge who falsely claimed to have been awarded two Medals of Honor and displayed counterfeit medals in his courtroom;[7] a television network’s military consultant who falsely claimed that he had received the Silver Star;[8] and a former judge advocate in the Marine Corps who lied about receiving the Bronze Star and a Purple Heart.[9]
As Congress recognized, the lies proscribed by the Stolen Valor Act inflict substantial harm. In many instances, the *743 harm is tangible in nature: Individuals often falsely represent themselves as award recipients in order to obtain financial or other material rewards, such as lucrative contracts and government benefits.[10] An investigation of false claims in a single region of the United States, for example, revealed that 12 men had defrauded the Department of Veterans Affairs out of more than $1.4 million in veteran’s benefits.[11] In other cases, the harm is less tangible, but nonetheless significant. The lies proscribed by the Stolen Valor Act tend to debase the distinctive honor of military awards. See Stolen Valor Act of 2005, § 2, 120 Stat. 3266, note following 18 U. S. C. § 704 (finding that “[fraudulent claims surrounding the receipt of [military decorations and medals] damage the reputation and meaning of such decorations and medals”). And legitimate award recipients and their families have expressed the harm they endure when an imposter takes credit for heroic actions that he never performed. One Medal of Honor recipient described the feeling as a “ ‘slap in the face of veterans who have paid the price and earned their medals.’”[12]
It is well recognized in trademark law that the proliferation of cheap imitations of luxury goods blurs the “ ‘signal’ given out by the purchasers of the originals.” Landes & Posner, Trademark Law: An Economic Perspective, 30 J. Law & Econ. 265, 308 (1987). In much the same way, the *744 proliferation of false claims about military awards blurs the signal given out by the actual awards by making them seem more common than they really are, and this diluting effect harms the military by hampering its efforts to foster morale and esprit de corps. Surely it was reasonable for Congress to conclude that the goal of preserving the integrity of our country’s top military honors is at least as worthy as that of protecting the prestige associated with fancy watches and designer handbags. Cf. San Francisco Arts & Athletics, Inc. v. United States Olympic Comm., 483 U. S. 522, 539-541 (1987) (rejecting First Amendment challenge to law prohibiting certain unauthorized uses of the word “Olympic” and recognizing that such uses harm the U. S. Olympic Committee by “lessening the distinctiveness” of the term).
Both the plurality and Justice Breyer argue that Congress could have preserved the integrity of military honors by means other than a criminal prohibition, but Congress had ample reason to believe that alternative approaches would not be adequate. The chief alternative that is recommended is the compilation and release of a comprehensive list or database of actual medal recipients. If the public could readily access such a resource, it is argued, imposters would be quickly and easily exposed, and the proliferation of lies about military honors would come to an end.
This remedy, unfortunately, will not work. The Department of Defense has explained that the most that it can do is to create a database of recipients of certain top military honors awarded since 2001. See Office of Undersecretary of Defense, Report to the Senate and House Armed Services Committees on a Searchable Military Valor Decorations Database 4-5 (2009).[13]
*745 Because a sufficiently comprehensive database is not practicable, lies about military awards cannot be remedied by what the plurality calls “counterspeech.” Ante, at 726. Without the requisite database, many efforts to refute false claims may be thwarted, and some legitimate award recipients may be erroneously attacked. In addition, a steady stream of stories in the media about the exposure of imposters would tend to increase skepticism among members of the public about the entire awards system. This would only exacerbate the harm that the Stolen Valor Act is meant to prevent.
The plurality and the concurrence also suggest that Congress could protect the system of military honors by enacting a narrower statute. The plurality recommends a law that would apply only to lies that are intended to “secure moneys or other valuable considerations.” Ante, at 723. In a similar vein, the concurrence comments that “a more finely tailored statute might. . . insist upon a showing that the false statement caused specific harm.” Ante, at 738 (opinion of Breyer, J.). But much damage is caused, both to real award recipients and to the system of military honors, by false statements that are not linked to any financial or other tangible reward. Unless even a small financial loss—say, a dollar given to a homeless man falsely claiming to be a decorated veteran—is more important in the eyes of the First Amendment than the damage caused to the very integrity of the military awards system, there is no basis for distinguishing between the Stolen Valor Act and the alternative statutes that the plurality and concurrence appear willing to sustain.
Justice Breyer also proposes narrowing the statute so that it covers a shorter list of military awards, ante, at 737-738 (opinion concurring in judgment), but he does not provide a hint about where he thinks the line must be drawn. Perhaps he expects Congress to keep trying until it eventually passes a law that draws the line in just the right place.
*746 II
A
Time and again, this Court has recognized that as a general matter false factual statements possess no intrinsic First Amendment value. See Illinois ex rel. Madigan v. Telemarketing Associates, Inc., 538 U. S. 600, 612 (2003) (“Like other forms of public deception, fraudulent charitable solicitation is unprotected speech”); BE&K Constr. Co. v. NLRB, 536 U. S. 516, 531 (2002) (“[FJalse statements may be unprotected for their own sake”); Hustler Magazine, Inc. v. Falwell, 485 U. S. 46, 52 (1988) (“False statements of fact are particularly valueless; they interfere with the truth-seeking function of the marketplace of ideas, and they cause damage to an individual’s reputation that cannot easily be repaired by counterspeech, however persuasive or effective”); Keeton v. Hustler Magazine, Inc., 465 U. S. 770, 776 (1984) (“There is ‘no constitutional value in false statements of fact’ ” (quoting Gertz v. Robert Welch, Inc., 418 U. S. 323, 340 (1974))); Bill Johnson’s Restaurants, Inc. v. NLRB, 461 U. S. 731, 743 (1983) (“[FJalse statements are not immunized by the First Amendment right to freedom of speech”); Brown v. Hartlage, 456 U. S. 45, 60 (1982) (“Of course, demonstrable falsehoods are not protected by the First Amendment in the same manner as truthful statements”); Herbert v. Lando, 441 U. S. 153, 171 (1979) (“Spreading false information in and of itself carries no First Amendment credentials”); Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U. S. 748, 771 (1976) (“Untruthful speech, commercial or otherwise, has never been protected for its own sake”); Gertz, supra, at 340 (“[TJhe erroneous statement of fact is not worthy of constitutional protection”); Time, Inc. v. Hill, 385 U. S. 374, 389 (1967) (“[TJhe constitutional guarantees [of the First Amendment] can tolerate sanctions against calculated falsehood without significant impairment of their essential function”); Garrison v. Louisiana, 379 U. S. 64, 75 (1964) (“[TJhe *747 knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection”).
Consistent with this recognition, many kinds of false factual statements have long been proscribed without ‘“rais[ing] any Constitutional problem.’” United States v. Stevens, 559 U. S. 460, 469 (2010) (quoting Chaplinsky v. New Hampshire, 315 U. S. 568, 571-572 (1942)). Laws prohibiting fraud, perjury, and defamation, for example, were in existence when the First Amendment was adopted, and their constitutionality is now beyond question. See, e. g., Donaldson v. Read Magazine, Inc., 333 U. S. 178, 190 (1948) (explaining that the government’s power “to protect people against fraud” has “always been recognized in this country and is firmly established”); United States v. Dunnigan, 507 U. S. 87, 97 (1993) (observing that “the constitutionality of perjury statutes is unquestioned”); Beauharnais v. Illinois, 343 U. S. 250, 256 (1952) (noting that the “prevention and punishment” of libel “have never been thought to raise any Constitutional problem”).
We have also described as falling outside the First Amendment’s protective shield certain false factual statements that were neither illegal nor tortious at the time of the Amendment’s adoption. The right to freedom of speech has been held to permit recovery for the intentional infliction of emotional distress by means of a false statement, see Falwell, supra, at 56, even though that tort did not enter our law until the late 19th century, see W. Keeton, D. Dobbs, R. Kee-ton, & D. Owen, Prosser and Keeton on Law of Torts § 12, p. 60, and n. 47. (5th ed. 1984) (hereinafter Prosser and Kee-ton). And in Hill, supra, at 390, the Court concluded that the free speech right allows recovery for the even more modern tort of false-light invasion of privacy, see Prosser and Keeton § 117, at 863.
In line with these holdings, it has long been assumed that the First Amendment is not offended by prominent criminal *748 statutes with no close common-law analog. The most well known of these is probably 18 U. S. C. § 1001, which makes it a crime to “knowingly and willfully” make any “materially false, fictitious, or fraudulent statement or representation” in “any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States.” Unlike perjury, § 1001 is not limited to statements made under oath or before an official government tribunal. Nor does it require any showing of “pecuniary or property loss to the government.” United States v. Gilliland, 312 U. S. 86, 93 (1941). Instead, the statute is based on the need to protect “agencies from the perversion which might result from the deceptive practices described.” Ibid, (emphasis added).
Still other statutes make it a crime to falsely represent that one is speaking on behalf of, or with the approval of, the Federal Government. See, e. g., 18 U. S. C. § 912 (making it a crime to falsely impersonate a federal officer); §709 (making it a crime to knowingly use, without authorization, the names of enumerated federal ageneies, such as “Federal Bureau of Investigation,” in a manner reasonably calculated to convey the impression that a communication is approved or authorized by the agency). We have recognized that § 912, like § 1001, does not require a showing of pecuniary or property loss and that its purpose is to “‘maintain the general good repute and dignity’” of Government service. United States v. Lepowitch, 318 U. S. 702, 704 (1943) (quoting United States v. Barnow, 239 U. S. 74, 80 (1915)). All told, there are more than 100 federal criminal statutes that punish false statements made in connection with areas of federal agency concern. See United States v. Wells, 519 U. S. 482, 505-507, and nn. 8-10 (1997) (Stevens, J., dissenting) (citing “at least 100 federal false statement statutes” in the United States Code).
These examples amply demonstrate that false statements of fact merit no First Amendment protection in their own *749 right.[14] It is true, as Justice Breyer notes, that many in our society either approve or condone certain discrete categories of false statements, including false statements made to prevent harm to innocent victims and so-called “white lies.” See ante, at 733. But respondent’s false claim to have received the Medal of Honor did not fall into any of these categories. His lie did not “prevent embarrassment, protect privacy, shield a person from prejudice, provide the sick with comfort, or preserve a child’s innocence.” Ibid. Nor did his lie “stop a panic or otherwise preserve calm in the face of danger” or further philosophical or scientific debate. Ibid. *750 Respondent’s claim, like all those covered by the Stolen Valor Act, served no valid purpose.
Respondent and others who join him in attacking the Stolen Valor Act take a different view. Respondent’s brief features a veritable paean to lying. According to respondent, his lie about the Medal of Honor was nothing out of the ordinary for 21st-century Americans. “Everyone lies,” he says. Brief for Respondent 10. “We lie all the time.” Ibid. “[H]uman beings are constantly forced to choose the persona we present to the world, and our choices nearly always involve intentional omissions and misrepresentations, if not outright deception.” Id., at 39. An academic amicus tells us that the First Amendment protects the right to construct “self-aggrandizing fabrications such as having been awarded a military decoration.” Brief for Jonathan D. Varat as Amicus Curiae 5.
This radical interpretation of the First Amendment is not supported by any precedent of this Court. The lies covered by the Stolen Valor Act have no intrinsic value and thus merit no First Amendment protection unless their prohibition would chill other expression that falls within the Amendment’s scope. I now turn to that question.
B
While we have repeatedly endorsed the principle that false statements of fact do not merit First Amendment protection for their own sake, we have recognized that it is sometimes necessary to “exten[d] a measure of strategic protection” to these statements in order to ensure sufficient “‘breathing space’ ” for protected speech. Gertz, 418 U. S., at 342 (quoting NAACP v. Button, 371 U. S. 415, 433 (1963)). Thus, in order to prevent the chilling of truthful speech on matters of public concern, we have held that liability for the defamation of a public official or figure requires proof that defamatory statements were made with knowledge or reckless disregard of their falsity. See New York Times Co. v. *751 Sullivan, 376 U. S. 254, 279-280 (1964) (civil liability); Garrison, 379 U. S., at 74-75 (criminal liability). This same requirement applies when public officials and figures seek to recover for the tort of intentional infliction of emotional distress. See Falwell, 485 U. S., at 55-56. And we have imposed “[ejxacting proof requirements” in other contexts as well when necessary to ensure that truthful speech is not chilled. Madigan, 538 U. S., at 620 (complainant in a fraud action must show that the defendant made a knowingly false statement of material fact with the intent to mislead the listener and that he succeeded in doing so); see also BE&K Constr., 536 U. S., at 531 (regulation of baseless lawsuits limited to those that are both “objectively baseless and subjectively motivated by an unlawful purpose”); Hartlage, 456 U. S., at 61 (sustaining as-applied First Amendment challenge to law prohibiting certain “factual misstatements in the course of political debate” where there had been no showing that the disputed statement was made “other than in good faith and without knowledge of its falsity, or . . . with reckless disregard as to whether it was false or not”). All of these proof requirements inevitably have the effect of bringing some false factual statements within the protection of the First Amendment, but this is justified in order to prevent the chilling of other, valuable speech.
These examples by no means exhaust the circumstances in which false factual statements enjoy a degree of instrumental constitutional protection. On the contrary, there are broad areas in which any attempt by the state to penalize purportedly false speech would present a grave and unacceptable danger of suppressing truthful speech. Laws restricting false statements about philosophy, religion, history, the social sciences, the arts, and other matters of public concern would present such a threat. The point is not that there is no such thing as truth or falsity in these areas or that the truth is always impossible to ascertain, but rather *752 that it is perilous to permit the state to be the arbiter of truth.
Even where there is a wide scholarly consensus concerning a particular matter, the truth is served by allowing that consensus to be challenged without fear of reprisal. Today’s accepted wisdom sometimes turns out to be mistaken. And in these contexts, “[e]ven a false statement may be deemed to make a valuable contribution to public debate, since it brings about ‘the clearer perception and livelier impression of truth, produced by its collision with error.’” Sullivan, supra, at 279, n. 19 (quoting J. Mill, On Liberty 15 (R. McCallum ed. 1947)).
Allowing the state to proscribe false statements in these areas also opens the door for the state to use its power for political ends. Statements about history illustrate this point. If some false statements about historical events may be banned, how certain must it be that a statement is false before the ban may be upheld? And who should make that calculation? While our cases prohibiting viewpoint discrimination would fetter the state’s power to some degree, see R. A. V. v. St. Paul, 505 U. S. 377, 384-390 (1992) (explaining that the First Amendment does not permit the government to engage in viewpoint discrimination under the guise of regulating unprotected speech), the potential for abuse of power in these areas is simply too great.
In stark contrast to hypothetical laws prohibiting false statements about history, science, and similar matters, the Stolen Valor Act presents no risk at all that valuable speech will be suppressed. The speech punished by the Act is not only verifiably false and entirely lacking in intrinsic value, but it also fails to serve any instrumental purpose that the First Amendment might protect. Tellingly, when asked at oral argument what truthful speech the Stolen Valor Act might chill, even respondent’s counsel conceded that the answer is none. Tr. of Oral Arg. 36.
*753 c
Neither of the two opinions endorsed by Justices in the majority claims that the false statements covered by the Stolen Valor Act possess either intrinsic or instrumental value. Instead, those opinions appear to be based on the distinct concern that the Act suffers from overbreadth. See ante, at 722 (plurality opinion) (the Act applies to “personal, whispered conversations within a home”); ante, at 736 (Breyer, J., concurring in judgment) (the Act “applies in family, social, or other private contexts” and in “political contexts”). But to strike down a statute on the basis that it is overbroad, it is necessary to show that the statute’s “overbreadth [is] substantial, not only in an absolute sense, but also relative to [its] plainly legitimate sweep.” United States v. Williams, 553 U. S. 285, 292 (2008); see also ibid. (noting that this requirement has been “vigorously enforced”). The plurality and the concurrence do not even attempt to make this showing.
The plurality additionally worries that a decision sustaining the Stolen Valor Act might prompt Congress and the state legislatures to enact laws criminalizing lies about “an endless list of subjects.” Ante, at 723. The plurality apparently fears that we will see laws making it a crime to lie about civilian awards such as college degrees or certificates of achievement in the arts and sports.
This concern is likely unfounded. With very good reason, military honors have traditionally been regarded as quite different from civilian awards. Nearly a century ago, Congress made it a crime to wear a military medal without authorization; we have no comparable tradition regarding such things as Super Bowl rings, Oscars, or Phi Beta Kappa keys.
In any event, if the plurality’s concern is not entirely fanciful, it falls outside the purview of the First Amendment. The problem that the plurality foresees—that legislative bodies will enact unnecessary and overly intrusive criminal *754 laws—applies regardless of whether the laws in question involve speech or nonexpressive conduct. If there is a problem with, let us say, a law making it a criminal offense to falsely claim to have been a high school valedictorian, the problem is not the suppression of speech but the misuse of the criminal law, which should be reserved for conduct that inflicts or threatens truly serious societal harm. The objection to this hypothetical law would be the same as the objection to a law making it a crime to eat potato chips during the graduation ceremony at which the high school valedictorian is recognized. The safeguard against such laws is democracy, not the First Amendment. Not every foolish law is unconstitutional.
The Stolen Valor Act represents the judgment of the people’s elected representatives that false statements about military awards are very different from false statements about civilian awards. Certainly this is true with respect to the high honor that respondent misappropriated. Respondent claimed that he was awarded the Medal of Honor in 1987 for bravery during the Iran hostage crisis. This singular award, however, is bestowed only on those members of the Armed Forces who “distinguis[h] [themselves] conspicuously by gallantry and intrepidity at the risk of [their lives] above and beyond the call of duty.” 10 U. S. C. § 3741; see also §§ 6241, 8741. More than half of the heroic individuals to have been awarded the Medal of Honor after World War I received it posthumously.[15] Congress was entitled to conclude that falsely claiming to have won the Medal of Honor is qualitatively different from even the most prestigious civilian awards and that the misappropriation of that honor warrants criminal sanction.
* * *
*755 The Stolen Valor Act is a narrow law enacted to address an important problem, and it presents no threat to freedom of expression. I would sustain the constitutionality of the Act, and I therefore respectfully dissent.

 Although the Act does not use the term “knowing” or “knowingly,” we have explained that criminal statutes must be construed “in light of the background rules of the common law ... in which the requirement of some mens rea for a crime is firmly embedded.” Staples v. United States, 511 U. S. 600, 605 (1994). The Act’s use of the phrase “falsely represents,” moreover, connotes a knowledge requirement. See Black’s Law Dictionary 1022 (8th ed. 2004) (defining a “misrepresentation” or “false representation” to mean “[t]he act of making a false or misleading assertion about something, usu. with the intent to deceive" (emphasis added)).

 See id., at 1327 (defining “representation” to mean a “presentation of fact”); see also Milkovich v. Lorain Journal Co., 497 U. S. 1, 20 (1990) (explaining that the Court has protected “statements that cannot ‘reasonably [be] interpreted as stating actual facts’ about an individual” so that “public debate will not suffer for lack of ‘imaginative expression’ or the ‘rhetorical hyperbole’ which has traditionally added much to the discourse of our Nation” (quoting Hustler Magazine, Inc. v. Falwell, 485 U. S. 46, 50 (1988); alteration in original)).

 Colimore, Pinning Crime on Fake Heroes: N. J. Agent Helps Expose and Convict Those With Bogus U. S. Medals, Philadelphia Inquirer, Feb. 11,2004, http://artides.philly.eom/2004-02-ll/news/25374213_l_medals-military-imposters-distinguished-flying-cross (all Internet materials as visited June 25, 2012, and available in Clerk of Court’s case file).

 Crewdson, Claims of Medals Amount to Stolen Valor, Chicago Tribune, Oct. 26, 2008, http://www.chicagotribune.com/news/local/chi-valor-oct25,0, 4301227.story?page=l.

 Half of MOH Entries in Oral History Project Are Incorrect, Marine Corps Times, Oct. 1, 2007, 2007 WLNR 27917486.

 Ibid.

 Young, His Honor Didn’t Get Medal of Honor, Chicago Tribune, Oct. 21, 1994, http://articles.chicagotribune.com/1994-10-21/news/9410210318_l_ congressional-medal-highest-fritz.

 Rutenberg, At Fox News, the Colonel Who Wasn’t, N. Y. Times, Apr. 29,2002, http://www.nytimes.com/2002/04/29/business/at-fox-news-the-colonel-who-wasn-t.html?pagewanted=all&sre=pm.

 B. Burkett & G. Whitley, Stolen Valor: How the Vietnam Generation Was Robbed of Its Heroes and Its History 179 (1998).

 Indeed, the first person to be prosecuted under the Stolen Valor Act apparently “parlayed his medals into lucrative security consulting contracts.” Zambito, War Crime: FBI Targets Fake Heroes, New York Daily News, May 6, 2007, http://www.nydailynews.com/news/crime/war-crime-fbi-targets-fake-heroes-article-1.249168.

 Dept. of Justice, Northwest Crackdown on Fake Veterans in “Operation Stolen Valor,” Sept. 21, 2007, http://www.justice.gov/usao/waw/press/ 2007/sep/operationstolenvalor.html.

 Cato, High Court Tussles With False Heroics: Free Speech or Felony? Pittsburgh Tribune Review, Feb. 23, 2012, http://triblive.com/usworld/ nation/1034434-85/court-military-law-false-medals-supreme-valor-act~ federal-free.

 In addition, since the Department may not disclose the Social Security numbers or birthdates of recipients, this database would be of limited use in ascertaining the veracity of a claim involving a person with a common name. Office of Undersecretary of Defense, Report, at 3-4.

 The plurality rejects this rule. Although we have made clear that “[ujntruthful speech . . . has never been protected for its own sake,” Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U. S. 748, 771 (1976), the most the plurality is willing to concede is that “the falsity of speech bears upon whether it is protected,” ante, at 721. This represents a dramatic—and entirely unjustified—departure from the sound approach taken in past cases.
Respondent and his supporting amici attempt to limit this rule to certain subsets of false statements, see, e. g., Brief for Respondent 53 (asserting that, at most, only falsity that is proved to cause specific harm is stripped of its First Amendment protection), but the examples described above belie that attempt. These examples show that the rule at least applies to (1) specific types of false statements that were neither illegal nor tortious in 1791 (the torts of intentional infliction of emotional distress and false-light invasion of privacy did not exist when the First Amendment was adopted); (2) false speech that does not cause pecuniary harm (the harm remedied by the torts of defamation, intentional infliction of emotional distress, and false-light invasion of privacy is often nonpecuni-ary in nature, as is the harm inflicted by statements that are illegal under §§912 and 1001); (3) false speech that does not cause detrimental reliance (neither perjury laws nor many of the federal false statement statutes require that anyone actually rely on the false statement); (4) particular false statements that are not shown in court to have caused specific harm (damages can be presumed in defamation actions involving knowing or reckless falsehoods, and no showing of specific harm is required in prosecutions under many of the federal false statement statutes); and (5) false speech that does not cause harm to a specific individual (the purpose of many of the federal false statement statutes is to protect government processes).

 See U. S. Army Center of Military History, Medal of Honor Statistics, http://www.history.army.mil/html/moh/mohstats.html.